**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Darrell H. LACK, Defendant–Appellant.**

No. 97–1467.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1997.

Decided Nov. 4, 1997.

Cheryl B. Schacht (argued), Office of the U.S. Attorney, Madison, WI, for Plainitff–Appellee.

Ralph A. Kalal (argued), Kalal & Associates, Madison, WI, for Defendant–Appellant.

Before BAUER, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

After a bench trial based on stipulated facts, the United States District Court for the Western District of Wisconsin found Darrell H. Lack guilty of one count of mail fraud and eleven counts of interstate transportation of stolen securities, in violation of 18 U.S.C. §§ 2, 1341 and 2314. Mr. Lack then appealed to this court. For the reasons set forth in the following opinion, we affirm the decision of the district court.

# I

## BACKGROUND

### A. *Pre-trial Facts*

On August 21, 1996, a federal grand jury sitting in the Western District of Wisconsin returned a twelve-count indictment against Mr. Lack. Count I of the indictment alleged that Mr. Lack committed and aided and abetted a mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Specifically, Count I charged that, from on or about August 14, 1991 to June 16, 1995, Mr. Lack, "having devised a scheme to defraud and for the purpose of executing that scheme, knowingly caused mail matter to be placed in the mail and delivered by the United States Postal Service." R.2 at 1. Counts II through XII charged Mr. Lack with the interstate transportation of stolen securities in violation of 18 U.S.C. §§ 2314 and 2. Each of those counts alleged that Mr. Lack knowingly and intentionally caused to be transported from Wisconsin to Minnesota or Georgia a specified stolen check with a value exceeding $5,000.

Prior to trial, Mr. Lack, essentially raising the same arguments he raises before this court, moved to dismiss all counts of the indictment for failure to allege the particular statutory offense. The district court denied Mr. Lack's motion to dismiss; it found all counts of the indictment to be sufficient and valid. Mr. Lack then waived his right to a jury trial, and on December 10, 1996, the parties filed a stipulation of facts with the court to be used for a bench trial on December 11, 1996.

### B. *Stipulated Facts*

Mr. Lack was employed as the materials manager by Dairyland Power Cooperative ("Dairyland"), a utility company located in LaCrosse, Wisconsin. In that capacity, he was responsible for the salvage and scrap operation of Dairyland which involved, among other things, the sale of various scrap or salvage items on behalf of Dairyland. Mr. Lack's job, therefore, was to sell items of equipment that his employer no longer needed. Sometime prior to August 1991, Mr. Lack became upset with Dairyland because several people had received advancements within the company and he had not. Due to his belief that he had been treated unfairly, Mr. Lack decided to take retaliatory action against the company. Specifically, he devised a scheme to steal money from Dairyland.

Mr. Lack launched his scheme on August 14, 1991 by opening a checking account at a bank in Madison, Wisconsin in the name of Darrell H. Lack, d/b/a Dairyland Power Con-

version, division of Midwest Computer.[1] As a result of his opening this account, the bank mailed, on a monthly basis between August 1991 and May 1995, account statements to an address provided by Mr. Lack. These statements contained a complete record of the status of the account for the previous month, including account balances and an identification of all credits and withdrawals to the account. The bank mailed the statements via the U.S. mails.

Once this account was opened, Mr. Lack began his scheme: In his capacity as materials manager, he would sell an item to a buyer. The buyer would pay by check, and Mr. Lack would deposit the check in the aforementioned account rather than forwarding it to his employer. Mr. Lack then would transfer funds from the Madison account to another account in LaCrosse. Occasionally, Mr. Lack would request a bank check from this second account for a smaller amount made out to Dairyland with the original purchaser listed as the remitter. He would then mail or deliver this check to Dairyland.

### C. Decision of the District Court

A bench trial based on these facts was held on December 11, 1996. After reviewing the stipulated facts and allowing for argument by counsel, the district court found Mr. Lack guilty of all twelve counts in the indictment. Announcing its decision in open court, the court first addressed Count I of the indictment which alleged that Mr. Lack violated the mail fraud statute, 18 U.S.C. § 1341. R.42 at 11. The court began its analysis of Count I by noting that § 1341 contains three elements: (1) participation in a scheme to defraud, (2) intent to defraud, and (3) use of the mails in furtherance of that scheme. *Id.*

The court then looked to the stipulated facts to determine if Mr. Lack had committed each of the elements of the offense. First, the district court found that Mr. Lack had participated in a scheme to defraud because he used "dishonest means or schemes"

to deprive Dairyland of the proceeds of the salvage sales. *Id.* at 18–19. Second, the court determined that Mr. Lack's own admissions demonstrated an intent to defraud Dairyland. *Id.* at 19. Finally, the court held that the mailing of the bank statements furthered Mr. Lack's scheme by giving his scheme the appearance of legitimacy, thereby concealing the scheme and allowing it to continue. In addition, the district court noted that the bank statements themselves allowed Mr. Lack to "thoroughly monitor the results of his fraudulent scheme." *Id.* at 20. Thus, the court found Mr. Lack guilty of Count I of the indictment.

The district court next turned to Counts II through XII of the indictment which alleged that Mr. Lack caused stolen checks to be shipped across state lines on eleven separate occasions in violation of 18 U.S.C. §§ 2 and 2314. In light of the stipulated facts, the court determined that Mr. Lack, on each occasion alleged, deposited the stolen checks at his Wisconsin bank "knowing very well" that those checks would then be transported across state lines to the banks on which those checks were drawn. *Id.* at 20. Thus, the court found Mr. Lack guilty of Counts II through XII of the indictment.

### II

### DISCUSSION

In this appeal, Mr. Lack submits that the district court erred in finding him guilty of Count I of the indictment because his conduct, as a matter of law, does not fall within the ambit of the mail fraud statute, 18 U.S.C. § 1341. In a similar vein, Mr. Lack also contends that the district court erred in finding him guilty of Counts II through XII of the indictment because his conduct does not constitute a violation of the statute prohibiting the interstate transportation of stolen checks, 18 U.S.C. § 2314. We shall address each of these arguments in turn.

---

**1.** At the same time he opened this account, Mr. Lack entered into a service agreement with a Madison based telephone answering service. This agreement was for a live operator answering service. Mr. Lack instructed the answering service to answer the telephone number assigned to him by stating, "Good morning, Dairyland Power Conversion." Mr. Lack never received any messages pursuant to this service.

### A. Count I: Mail Fraud

We have held that the government, in order to show a violation of § 1341, must prove three elements beyond a reasonable doubt: (1) the defendant's participation in a scheme to defraud, with (2) the intent to defraud, while (3) using the United States mails or a private carrier to further that scheme. *See United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir.1993), *cert. denied*, 511 U.S. 1096, 114 S.Ct. 1863, 128 L.Ed.2d 485 (1994). Mr. Lack argues that, under this test, his conduct does not constitute a violation of § 1341 because he did not participate in a "scheme to defraud"; moreover, even if he did engage in such a scheme, he argues that the mailing of the bank statements did not further his scheme.

Mr. Lack first argues that he did not violate § 1341 because he did not participate in a "scheme to defraud." Instead of showing a "scheme to defraud," Mr. Lack asserts, the stipulated facts merely describe a series of simple thefts. Mr. Lack contends that this series of thefts cannot be characterized as a "scheme to defraud" because there is no evidence that he engaged in any deception, misrepresentation, or act of trickery or chicanery by which Dairyland Power Cooperative was induced to part with its money. In other words, Mr. Lack says that he didn't trick Dairyland into giving him its money; he just took it.

Mr. Lack's argument on this point is without merit. Indeed, the Supreme Court has said that the words "to defraud" in the mail fraud statute "refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987). Under that definition, there is no doubt that Mr. Lack was engaged in a "scheme to defraud" Dairyland. The stipulated facts lead to this inevitable conclusion: He misused his fiduciary capacity with respect to the funds he received on behalf of Dairyland; he opened a bank account under a name virtually identical to that of his employer; he set up a live operator telephone answering service which was answered with the greeting, "Good morning, Dairyland Power Conversion"; he endorsed the checks with an official endorsement stamp that read "Dairyland Power Co."; and he also sent smaller checks to his employer from his own account listing the purchaser of the equipment as the remitter. This pattern of deceit and use of false pretenses is clearly a "scheme to defraud."

Mr. Lack next submits that, even if he was engaged in a scheme to defraud, his conduct still does not fall under the ambit of the mail fraud statute because he did not use the mails to further his scheme. Specifically, Mr. Lack contends that the district court's determination that his scheme was furthered by the bank's mailing of the monthly bank statements is "simply wrong." In fact, Mr. Lack claims that each scheme reached its fruition when he deposited the check. Thus, receiving the statements *ex post facto* in no way affirmatively aided or furthered the scheme. Instead, Mr. Lack argues, the mailing of the bank statements was entirely irrelevant to the execution of the scheme.

In making this argument, Mr. Lack relies primarily on two Supreme Court cases: *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) and *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). In *Kann*, the defendants, officers and directors of a corporation that manufactured munitions, allegedly used a dummy corporation to divert company profits from government contracts into their own pockets. *Id.* at 89–92, 65 S.Ct. at 148–50. As part of the scheme, the defendants cashed two checks at local banks consisting of a portion of the diverted proceeds; these checks were then mailed to the banks on which they were drawn. *Id.* at 92, 65 S.Ct. at 149–50. The mail fraud charged was based on these mailings. The Supreme Court, however, held that the mailing of the cashed checks to the drawee banks was not in furtherance of defendants' scheme. *Id.* at 94, 65 S.Ct. at 150–51. The Court reasoned that defendants' scheme already had reached fruition and that "[i]t was not material to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank."

*Id.* The Court also noted that "[t]he federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud." *Id.* at 95, 65 S.Ct. at 151.

In *Maze*, the defendant stole his roommate's credit card and used it to obtain food and lodging at motels during a spring trip from Kentucky through Louisiana, Florida and California. *See* 414 U.S. at 396, 94 S.Ct. at 646–47. The government argued that the statutory mailing element was satisfied because Maze knew that each motel proprietor would mail an invoice to the bank that issued the card, which in turn would mail a bill to the card owner for payment. *Id.* at 397, 94 S.Ct. at 647. The Court, however, held that these mailings were not in furtherance of Maze's scheme because the scheme had reached fruition each time he checked out of the hotel. *Id.* at 402, 94 S.Ct. at 649. Thus, the mailings occurred after the scheme was completed and served merely to determine which of the victims ultimately would bear the loss. *Id.* Furthermore, the Court emphasized that the success of the defendant's scheme in no way depended on the mailings; in fact, Maze probably would have preferred that these mailings had never occurred. *Id.*; *see also Parr v. United States*, 363 U.S. 370, 393, 80 S.Ct. 1171, 1184–85, 4 L.Ed.2d 1277 (1960) (holding that credit card company's mailing of invoices to customer was not in furtherance of scheme in which customer's employees used card to make unauthorized purchases).

Mr. Lack argues that *Kann* and *Maze* stand for the principle that mailings which occur after the fraudulent act ordinarily are not "in furtherance" of the fraud because the scheme has already accomplished its goal. He argues, therefore, that the mailings in this case, like those in *Kann* and *Maze*, were completely irrelevant to the success of his scheme. Although it is true that *Kann, Parr*

and *Maze* represent important limitations on the government's use of the mail fraud statute, these cases must be considered together with the Court's more recent holding in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Indeed, "[a]lthough *Schmuck* did not overrule *Kann, Parr*, and *Maze*, it emphasized that courts must consider the full scope of the scheme when determining the sufficiency of the mailing element." *United States v. Ashman*, 979 F.2d 469, 482 (7th Cir.1992), *cert. denied*, 510 U.S. 814, 114 S.Ct. 62, 126 L.Ed.2d 32 (1993).

In *Schmuck*, the defendant purchased used cars, rolled back the odometers, and sold them to Wisconsin retail dealers at prices artificially inflated by the low-mileage readings. The unwitting dealers, relying on the altered readings, resold the cars to customers at inflated prices, consummating the transactions by mailing title application forms to the state on behalf of the buyers. *Schmuck*, 489 U.S. at 707, 109 S.Ct. at 1446. In reaching the conclusion that the mailing of the title application forms to the state was sufficient to satisfy the "use of the mails" requirement of the mail fraud statute, the Court stated: "To be part of the execution of the fraud ... the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Id.* at 710–11, 109 S.Ct. at 1448. In particular, the Court found that the success of Schmuck's ongoing scheme depended upon his continued harmonious relationship with, and good reputation among, retail dealers which in turn required the smooth flow of cars from the dealers to their Wisconsin customers. Thus, the mailings were part of the execution of the fraudulent scheme which did not reach fruition until the retail dealers resold the cars and effected transfers of title. *Id.* at 711–12, 109 S.Ct. at 1448.[2]

In addition to *Schmuck*, the Supreme Court's decision in *United States v. Lane*,

---

**2.** The Court held that the mailings in *Kann, Parr* and *Maze* were distinguishable from those in *Schmuck* because the mailings in those cases occurred after those schemes had reached fruition, involved only the allocation of loss among the victims and did not figure in the success of those schemes. *Schmuck*, 489 U.S. at 714, 109

S.Ct. at 1449–50. By contrast, the title registration mailings in *Schmuck* were an "essential step" in the scheme because the long-term success of Schmuck's ongoing fraudulent venture depended on successful resale of the vehicles which in turn depended on the passage of title. *Id.*

474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) is also instructive on this issue. In *Lane*, the defendants perpetuated a scheme to set fire to a duplex they owned in order to collect the insurance proceeds. *Id.* at 441, 106 S.Ct. at 727–28. Once the duplex was burned, the defendants, on three separate occasions, signed proof-of-loss claims for repairs and submitted them to an insurance adjuster, who issued drafts in return totaling $12,000. *Id.* Each time, the adjuster later mailed the proof-of-loss claims to the insurer's headquarters. *Id.* The government argued that these mailings satisfied the "in furtherance" requirement. The Supreme Court agreed, holding that "mailings which facilitate concealment of the scheme" are covered by the statute. *Id.* at 453, 106 S.Ct. at 734. The Court reasoned that the mailings were intended to "lull" the insurer into a false sense of security by giving the impression of an innocent claim. *Id.* at 452, 106 S.Ct. at 733; *see also United States v. Sampson*, 371 U.S. 75, 80–81, 83 S.Ct. 173, 175–76, 9 L.Ed.2d 136 (1962) (holding that post-fraud mailings assuring victims that their money was received and that the promised services would be performed were in furtherance of the fraudulent scheme). Thus, in both *Schmuck* and *Lane*, the Court held that mailings are in furtherance of the scheme when they help cloak the scheme with an aura of legitimacy, thereby preventing its detection and allowing it to continue.

This court has also held on several occasions that mailings which occur after the defendant has obtained the victims' money are in furtherance of the scheme if they facilitate concealment or postpone investigation of the scheme. *See United States v. Laurenzana*, 113 F.3d 689, 694 (7th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 240, — L.Ed.2d — (1997); *Ashman*, 979 F.2d at 483; *United States v. O'Connor*, 874 F.2d 483, 486 (7th Cir.1989); *United States v. Eckhardt*, 843 F.2d 989, 994 (7th Cir.), *cert. denied*, 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988). For example, in *Ashman*, the defendants, brokers and traders on the Chicago Board of Trade, perpetuated a scheme in which they arranged trades outside of the competitive marketplace of the exchange floor in contravention of federal law. *Ashman*, 979 F.2d at 476. In this way, the defendants were able to manipulate customer orders to create guaranteed profits for themselves. *Id.* Once these trades were consummated, the defendants mailed (or wired) statements confirming the execution of the trades to their customers. *Id.* at 481. The government argued that these mailings were in furtherance of the defendants' scheme to defraud their customers. We agreed, holding "that, through the mailing and wiring of the confirmation statements, the defendants advised customers of the results of their orders, helping to conceal the fraudulent trading and thereby furthering the scheme." *Id.* In reaching this conclusion, we reasoned that, by creating the "appearance of legitimate trading," the defendants led the customers to believe that the broker had attempted to obtain the best price available in the market. *Id.* at 483. Thus, the mailings helped to maintain the defendants' positions of trust as brokers and traders, which in turn allowed the scheme to continue. *Id.*

The mailings in this case, like those in *Schmuck, Lane* and *Ashman*, helped to conceal Mr. Lack's fraudulent scheme, thereby allowing it to continue. In order to execute his scheme, it was necessary for Mr. Lack to open a bank account to launder the money. Mr. Lack opened this account under a name virtually identical to that of his employer and provided the bank with a mailing address for his "business" to which the monthly statements were mailed. This account helped to cloak Mr. Lack's fraudulent venture with an aura of legitimacy, preventing both his customers and the bank from growing suspicious and thereby allowing the scheme to continue. With respect to his customers, the bank account (with its bogus name) deceived the customers into thinking they were dealing with Dairyland. With respect to the bank, the mailing address deceived the bank by creating the impression that the account holder was a legitimate business. *See Ashman*, 979 F.2d at 483. If either the bank or the customers grew suspicious of Mr. Lack's "business," his scheme would be exposed. Indeed, any suspicion on the part of either the bank or his customers "would have jeopardized [the defendant's] relationship of trust

and goodwill with [those] upon whose unwitting cooperation his scheme depended." *Schmuck*, 489 U.S. at 714, 109 S.Ct. at 1450. In this way, the bank account was clearly an essential part of Mr. Lack's scheme. Thus, because the mailing of the bank statements was incident to the opening of that account, those mailings were "in furtherance" of Mr. Lack's scheme. *Id.* at 712, 109 S.Ct. at 1448–49.

In addition, as the district court noted, the bank statements themselves helped Mr. Lack to conceal his scheme by allowing him to monitor carefully its progress. The record supports that conclusion. As part of his scheme, Mr. Lack would transfer money from the Madison account to another bank account in LaCrosse. Mr. Lack then would request a bank check from this second account made out to Dairyland. That check would typically list the original purchaser as the remitter and would be for an amount much smaller than that originally received by Mr. Lack. These payments served to "lull" Dairyland into thinking all was well. *See Lane*, 474 U.S. at 452, 106 S.Ct. at 733–34. The bank statements aided Mr. Lack in this effort by serving as the accounting books of his operation; they allowed him to manage the flow between the two accounts and avoid overdrafting the first account. In this way, the bank statements themselves furthered Mr. Lack's scheme.

### B. *Counts II–XII: Interstate Shipment of Stolen Checks*

■ In Counts II through XII of the indictment, the government charged Mr. Lack with the interstate transportation of stolen checks in violation of 18 U.S.C. §§ 2314 and 2(b). In this case, the stipulated facts show that Mr. Lack, during the execution of his scheme, received 11 checks, each for an amount in excess of $5,000, drawn on banks outside of Wisconsin. Thus, when Mr. Lack deposited these checks in his Madison account, they were sent across state lines by the depository bank to the drawee bank as part of the regular collection process.

We begin our analysis by considering the relevant statutory language. Section 2314 provides in pertinent part:

Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported ... in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more; ...

...

Shall be fined under this title or imprisoned not more than ten years, or both.

Section 2(b) reads as follows:

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Although Mr. Lack's conduct appears to be a clear violation of the second paragraph of § 2314, Mr. Lack argues that the government, because of its decision to include a reference to § 2(b) in the indictment, must show that Mr. Lack "willfully caused" the banks to send the checks across state lines. Mr. Lack contends that the stipulated facts show that the banks sent the checks across state lines pursuant to their regular collection process. Thus, he says, he did not "willfully cause" any of the alleged violations of § 2314.

■ Mr. Lack's argument, however, is unpersuasive. First, the second paragraph of § 2314 clearly allows for one to be charged under that statute if one causes stolen checks to be transported in interstate commerce as part of a scheme or artifice to defraud. The government's decision to include the aiding and abetting theory of § 2(b) in the indictment did not preclude the district court from determining that Mr. Lack himself had violated the second paragraph of § 2314. *See United States v. Lennon*, 751 F.2d 737, 741 (5th Cir.), *cert. denied*, 471 U.S. 1100, 105

S.Ct. 2324, 85 L.Ed.2d 842 (1985). Moreover, the Supreme Court has held that an individual may be found guilty under the first paragraph of that statute (when read in conjunction with 18 U.S.C. § 2(b)) even if he did not actually mail or transport anything himself; instead, it is sufficient to show that he caused it to be done. *See Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). Thus, the nature of the transporting required under either paragraph one or two of § 2314 is the same, and neither paragraph requires that the defendant have knowledge of the interstate transportation or that such transportation be reasonably foreseeable to him. *See United States v. Ludwig,* 523 F.2d 705, 706 n. 2 (8th Cir.1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86 (1976). In this case, Mr. Lack caused the checks to be mailed across state lines by depositing them in his Wisconsin account, and thus is guilty under both paragraphs one and two of § 2314.

### Conclusion

For the foregoing reasons, the decision of the district court is affirmed.

AFFIRMED.