**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> ETHAN FARID JINIAN, AKA Farid Khoujinian, *Defendant-Appellant*. | No. 11-10593 <br><br> D.C. No. 3:09-cr-01103-JSW-1 <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
October 18, 2012—San Francisco, California

Filed March 26, 2013

Before: Dorothy W. Nelson, Mary H. Murguia, and
Morgan Christen, Circuit Judges.[1]

Opinion by Judge Murguia;
Concurrence by Judge Christen

---

[1] This case was submitted to a panel that included Judge Betty B. Fletcher, who recently passed away. Following Judge Fletcher's death, Judge Christen was drawn by lot to replace Judge Fletcher. Judge Christen has read the briefs, reviewed the record, and listened to the oral argument.

# SUMMARY*

## Criminal Law

The panel affirmed a defendant's conviction and sentence on thirteen counts of wire fraud in violation of 18 U.S.C. § 1343 stemming from a scheme to defraud his employer, Bricsnet FM America, Inc., by diverting part of the company's profits to a shell company through which the defendant and other employees distributed the diverted profits in the form of salaries, dividends, and bonuses.

The defendant asserted that routine wire communications between two California banks and the Federal Reserve Bank in Dallas occurred after the defendant deposited the monies into his Mechanics Bank account and, as a result, were neither initiated for the purpose of defrauding Bricsnet nor related to his scheme to defraud. The panel disagreed because the defendant conducted an ongoing scheme to defraud Bricsnet, and even if each check the defendant deposited is viewed as a discrete fraudulent scheme, the interstate wire communications were necessary to complete the fraud.

The panel rejected the defendant's arguments that his conviction should be overturned because there was insufficient evidence to prove that his use of an interstate wire communication was reasonably foreseeable and because the jury should have been instructed to find the same. The panel wrote that no *mens rea* requirement exists with regard

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to the jurisdictional, interstate nexus of the defendant's actions under § 1343, which requires only that the defendant used – or caused the use of – interstate wires in furtherance of his scheme to defraud Bricsnet.

The panel held that § 1343 is a valid extension of congressional power under the Commerce Clause, and that since Congress enacted the statute based upon a constitutionally enumerated power, analysis of the statute under the Necessary and Proper Clause is inappropriate. The panel also held that because § 1343 is a valid exercise of powers delegated to Congress by the Commerce Clause, the defendant's Tenth Amendment challenge to the statute fails.

Concurring, Judge Christen wrote separately to emphasize the attribute of the defendant's fraudulent scheme that is fatal to his argument that his crime was complete upon the deposit of each check into his account at Mechanics Bank. She wrote that when the identity of the ultimate victim matters to the perpetrator's ability to repeat an ongoing scheme, the crime is not complete until the intended victim is swindled.

## COUNSEL

Benjamin L. Coleman, Coleman & Balogh LLP, San Diego, California; and Ethan A. Balogh, Coleman & Balogh LLP, San Francisco, California, for Defendant–Appellant.

Suzanne Miles, Assistant United States Attorney, San Francisco, California, for Plaintiff–Appellee.

## OPINION

MURGUIA, Circuit Judge:

Ethan Farid Jinian was charged with fourteen counts of wire fraud in violation of 18 U.S.C. § 1343 stemming from his scheme to defraud his employer.  Jinian contends that the district court erred in denying his motions for judgment of acquittal, a new trial, and for an arrest of judgment. Specifically, he argues that (1) routine transmissions occurring during the interbank collection process are not made for the purpose of executing a scheme to defraud or in furtherance thereof, (2) the jury should have been instructed that it was necessary to find that the interstate nature of the wire communications was reasonably likely or foreseeable, (3) there was insufficient evidence to establish that an interstate wire communication was reasonably foreseeable between two California banks, and (4) the wire fraud statute is unconstitutional as applied to him.  We reject these arguments and affirm Jinian's conviction and sentence.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

From 2004 until 2008, Jinian served as the chief executive officer ("CEO") of Bricsnet FM America, Inc. ("Bricsnet"), a company that developed and sold software.  As CEO, Jinian was authorized to spend Bricsnet monies to further its business operations and make executive and financial decisions.  He was also responsible for reviewing the company's daily expenditures.  Briscnet's board of directors and a majority of its investors were located in Europe, enabling Jinian to control Briscnet's operations from the company's San Francisco, California office with limited daily oversight.

In 2006, Jinian informed Leon Brown, Bricsnet's finance manager, that the company's chairman of the board of directors authorized Jinian to receive compensation in excess of his annual salary and to draw advances on that compensation. Unbeknownst to Brown, Jinian never received any such authorization. Nevertheless, Brown, in reliance upon Jinian's representations, began issuing to Jinian checks from Bricsnet's account at Silicon Valley Bank in Santa Clara, California. Jinian deposited these checks into his account at Mechanics Bank in Hercules, California.

Jinian instructed Brown to issue multiple, small-denomination checks instead of a single, lump-sum payment. Between November 2006 and September 2008, Jinian obtained from Brown nearly 100 checks, ranging in monthly amounts from $25,000 to over $60,000. The checks were issued regularly, some within days of each other. In total, Jinian improperly obtained over $1.5 million from Bricsnet.

Jinian was indicted on fourteen counts of wire fraud, which corresponded to fourteen Bricsnet checks Jinian deposited into his Mechanics Bank account. At trial, the government presented evidence showing that Mechanics Bank utilized the Federal Reserve Bank as an intermediary between it and Silicon Valley Bank to process the checks for payment. Howard Ng, an internal auditor for the Federal Reserve Bank, testified about the process through which checks were cleared. Ng explained that, when Jinian deposited a check into his Mechanics Bank account, Mechanics Bank sent an electronic image of the check via wire communication to the Federal Reserve Bank, which utilized an image server located in Dallas, Texas to sort and process the check. Once the check was processed in Dallas, Ng testified, the Federal Reserve Bank wired an image of the

check to Silicon Valley Bank to be negotiated and paid. Ng testified that these wire communications facilitated the check clearing process by ensuring that the appropriate accounts were debited and credited.

At the close of the government's case and the close of all evidence, Jinian moved, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal, arguing that the government failed to prove each element of wire fraud beyond a reasonable doubt. The district court denied Jinian's motion, and the jury returned a guilty verdict on thirteen of fourteen counts charged in the indictment.

Following his conviction, Jinian renewed his motion for judgment of acquittal. Jinian also moved for a new trial and for an arrest of judgment pursuant to Federal Rules of Criminal Procedure 33 and 34, respectively, arguing, among other things, that there was insufficient evidence that he knew—or knew it was reasonably likely—that interstate wires would be used to further the fraudulent scheme. The district court again denied Jinian's motions and affirmed the jury's convictions. It then sentenced Jinian to sixty-four months imprisonment, three years of supervised release, and ordered him to pay restitution of $1,587,860.04.

Jinian timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.  STANDARD OF REVIEW

We review de novo a district court's interpretation of a criminal statute, *United States v. Dahl*, 314 F.3d 976, 977 (9th Cir. 2002), and denial of a motion for judgment of acquittal, *United States v. Anaya-Acosta*, 629 F.3d 1091,

1093 (9th Cir. 2011). Sufficient evidence to support a conviction exists if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We also review de novo whether the district court's jury instructions adequately presented the defendant's theory of the case and whether the district court presented the jury with every element of the crime. *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997). If the district court's instructions fairly and adequately covered the elements of the offense, then we review the instruction's "'precise formulation' for an abuse of discretion." *Id.* Finally, we review de novo questions regarding the constitutionality of a federal statute. *United States v. Zakharov*, 468 F.3d 1171, 1176 (9th Cir. 2006).

## III.  DISCUSSION

The wire fraud statute criminalizes conduct by any person who, "having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . ." 18 U.S.C. § 1343 (2006). Section 1343, however, "does not purport to reach all frauds, but only those limited instances" wherein use of a wire "is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 95 (1944).[2]

---

[2] *Kann* involved alleged violations of the mail fraud statute. Since mail and wire fraud are both defined as "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud. *United States v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011). "The specific intent requirement is an aspect of the 'scheme to defraud' requirement; i.e., there is no fraudulent scheme without specific intent." *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980). "One 'causes' use of . . . wire communications where such use can reasonably be foreseen, even though not specifically intended." *United States v. Cusino*, 694 F.2d 185, 188 (9th Cir. 1982). A wire communication is "in furtherance" of a fraudulent scheme if it is "incident to the execution of the scheme," *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000), meaning that it "need not be an essential element of the scheme, just a 'step in the plot,'" *United States v. Garlick*, 240 F.3d 789, 795 (9th Cir. 2001) (quoting *Schmuck v. United States*, 489 U.S. 705, 711 (1989)); *accord United States v. Garner*, 663 F.2d 834, 838 (9th Cir. 1981) (explaining that the wire transfer "need only be made for the purpose of executing the scheme").

For purposes of 18 U.S.C. § 1343, a wire communication cannot be "part of an after-the-fact transaction that, although foreseeable, was not in furtherance of the defendant's fraudulent scheme." *Lo*, 231 F.3d at 478. Ultimately, "the issue is not one purely of time sequence." *Id.* As the Supreme Court recognized in *United States v. Sampson*, "subsequent mailings can in some circumstances provide the

representations, or promises," 18 U.S.C. §§ 1341, 1343, "the wire fraud statute is read in light of the case law on mail fraud," *United States v. Manarite*, 44 F.3d 1407, 1411 n.5 (9th Cir. 1995); *accord Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (applying the same analysis to mail and wire fraud).

basis for an indictment under the mail fraud statutes." 371 U.S. 75, 80 (1962). Thus, the "relevant question at all times" is whether a wire "is part of the execution of the scheme as conceived by the perpetrator at the time," *Schmuck*, 489 U.S. at 715, not whether the defendant, prior to the wiring, "had obtained all the money [he] expected to get," *Sampson*, 371 U.S. at 79.

## A.

Jinian's principle argument is that the Supreme Court's decision in *Kann* is legally indistinguishable from this case and, as such, compels a reversal of his conviction and entry of judgment of acquittal. Kann, together with six other employees, devised a scheme to defraud their employer by diverting part of the company's profits to a shell company through which the defendants distributed the diverted profits in the form of salaries, dividends, and bonuses. *Kann*, 323 U.S. at 89–90. The defendants were indicted on three counts—based upon three banking transactions—of using the mail in execution of a scheme to defraud, though the government abandoned the first count at trial.[3] *Id.* at 89–91. Kann was convicted on the remaining two counts. *Id.* at 89; *supra* note 3. Challenging his conviction, Kann argued that the mailing of the checks by the banks "could not be for the purpose of executing the scheme since the defendants to

---

[3] The second count alleged that the defendants, who defrauded a contractor hired to build a factory for their shell company, endorsed and cashed in Maryland the contractor's check in the amount of $12,000, which the Maryland bank then "deposited in the mail to be delivered to the bank in Wilmington, Delaware, on which it was drawn." *Kann*, 323 U.S. at 92. The third count alleged that one defendant deposited a check in the amount of $5,000 at a Delaware bank, which then mailed the check to the drawee bank located in Maryland. *Id.* at 92.

whom those checks were delivered had received the money represented by the checks and each transaction, after such receipt, was irrevocable as respects the drawer." *Kann*, 323 U.S. at 93.

The Supreme Court agreed with Kann, explaining that the defendants received the money "irrevocably" once the two checks were cashed or deposited, which constituted the point at which "the scheme in each case had reached fruition."[4] *Id.* at 94; *accord id.* at 95 (determining that "the scheme was completely executed as respects the transactions in question when the defendants received the money intended to be obtained by their fraud"). The banks became the owners of the checks once they were cashed or deposited and, "being holders in due course, were entitled to collect from the drawee bank . . . and the drawer had no defense to payment." *Id.* at 94. Reasoning that it was "immaterial" to the defendants "or to any consummation of the scheme[] how the bank which paid or credited the check would collect from the drawee bank," *id.*, the *Kann* Court concluded that, based upon the facts before it, the "subsequent banking transactions between the banks concerned were merely incidental and collateral to the scheme and not a part of it." *Id.* at 95. Because the mailings at issue were not for the purpose of executing the fraud, the Supreme Court reversed Kann's conviction. *Id.*

---

[4] The Supreme Court, however, rejected Kann's contention that he lacked the requisite intent under the mail fraud statute based upon the fact that he had no reasonable belief that the checks would go through the mails, explaining: "[W]e think it a fair inference that those defendants who drew, or those who cashed, the checks believed that the banks which took them would mail them to the banks on which they were drawn, and assuming [Kann] participated in the scheme, their knowledge was his knowledge." *Kann*, 323 U.S. at 93.

Jinian asserts that the wire communications between the two California banks and the Federal Reserve Bank in Dallas, like the mailings in *Kann*, occurred after he deposited the monies into his Mechanics Bank account and, as a result, were neither initiated for the purpose of defrauding Bricsnet nor related to his scheme to defraud. We disagree for two reasons. First, Jinian conducted an ongoing scheme to defraud Bricsnet. Second, even if we view each check Jinian deposited as a discrete fraudulent scheme, the interstate wire communications were necessary to complete and conceal each fraud.

*Kann* involved two discrete, independent transactions. There was no indication that the transactions were sequential or that the success of one depended upon the other. Although the government argued in *Kann* that the two transactions were part of a larger scheme devised by the defendants to commit future frauds against their employer, the *Kann* Court construed the scheme narrowly, focusing upon the "transactions in question" and explaining that the scheme was "completely executed" once the defendants "received the money intended to be obtained by their fraud." *Id.* at 95. Determining that the funds were irrevocably in the defendants' possession at the moment the checks were deposited or cashed, *id.* at 94, the *Kann* Court concluded that the subsequent interbank mailings were separate and distinct from the defendants' fraudulent scheme. *Id.* at 95.

Jinian's conduct, in contrast to the circumstances at issue in *Kann*, suggests that he executed an ongoing scheme to defraud Bricsnet. The government, which charged Jinan with fourteen counts of wire fraud, introduced evidence showing that Jinian deposited nearly 100 checks over the course of a two-year period. Thus, Jinian's ability to perpetuate his

scheme without interruption for two years was dependent upon the successful completion of the check clearing process for each Briscnet check Jinian deposited into his Mechanics Bank account. *See Schmuck*, 489 U.S. at 711–12.

While *Kann* certainly represents an "important limitation[] on the government's use of the mail fraud statute," *United States v. Lack*, 129 F.3d 403, 407 (7th Cir. 1997), we must consider it in light of the Supreme Court's more recent pronouncements in *Schmuck*. *See United States v. Ashman*, 979 F.2d 469, 482 (7th Cir. 1992) (acknowledging that *Schmuck* did not overrule *Kann*). The fraudulent scheme in *Schmuck* was devised by a used-automobile distributor who rolled back odometers and sold the vehicles to dealers at artificially inflated prices. 489 U.S. at 707. The dealers then resold the automobiles to customers. *Id.* In order to complete the resale of each automobile to its customers, the dealers had to obtain title to each vehicle. *Id.* To that end, the dealers mailed title application forms to the state on behalf of their customers. *Id.* Schmuck was indicted on—and convicted of—twelve counts of mail fraud, *id.*, and challenged his conviction on the basis that the mailings were routine, occurred after the fraud came to fruition, and were "merely tangentially related to the fraud," *id.* at 711.

The Supreme Court disagreed with Schmuck's characterization of the mailings. *Id.* Focusing upon the "scope" of the fraudulent scheme, the *Schmuck* Court observed that Schmuck did not engage in a "'one-shot' operation in which he sold a single car to an isolated dealer" but rather maintained "an ongoing fraudulent venture." *Id.* at 711. The scheme, the *Schmuck* Court reasoned, "did not reach fruition until the retail dealers resold the cars and effected transfers of title" and would have "come to an abrupt

halt" if the dealers were unable to resell the cars they purchased from Schmuck. *Id.* at 712. Thus, it concluded that, "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme." *Id.* The registration-form mailings were therefore distinguishable from the intrabanking mailings in *Kann* because the former were "essential step[s] in the successful passage of title to the retail purchasers," while the latter "involved little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Id.* at 714. On this basis, the *Schmuck* Court held that a rational jury could have found that the title-registration mailings were part of the execution of Schmuck's fraudulent scheme. *Id.* at 712.

We conclude that Jinian's conduct is more akin to the fraud perpetrated in *Schmuck* than in *Kann*. The scheme in *Schmuck* remained incomplete until the mailing activity, thereby rendering the mailing an "essential step in the successful passage of title," occurred. *Id.* at 714. Similarly, Jinian's scheme remained incomplete—and Jinian could not permanently access the monies he deposited—until the interstate wire communication completed each deposit transaction, thereby rendering it an "essential step" in facilitating the transfer of funds from Bricsnet's Silicon Valley Bank account to Jinian's Mechanics Bank account. Simply stated, Jinian's deposit of each check implicated use of a wire—and its interstate component—and was therefore "part of the execution of the scheme as conceived by [Jinian] at the time" he devised his scheme. *Id.*

Our ruling today is consistent with the manner in which we, as well as our sister courts, have interpreted *Kann* and *Schmuck*.  For example, in *United States v. Shipsey*, a case involving the diversion of construction loan proceeds through wire payment transfers, we distinguished *Kann* by observing that the fraudulent scheme "did not 'reach fruition'" when the wire draw requests were submitted and concluded, under the logic of *Schmuck*, that the wires were incident to an essential part of the fraudulent scheme.  363 F.3d 962, 965–66, 972 (9th Cir. 2004).  The Seventh Circuit, in *Lack*, distinguished the mailings at issue in that case—opening a bank account to launder money and providing a mailing address to which monthly statements were mailed—from those in *Kann* by explaining that they, like the mailings in *Schmuck*, helped conceal and were in furtherance of the fraudulent scheme.  129 F.3d at 408–09.  The Third Circuit, affirming a conviction for mail fraud where the defendant "devised and executed a scheme to obtain additional bonuses" from her employer by falsifying reports, distinguished *Kann* by explaining that the fraud was "ongoing," rather than involving a single false report, and was therefore similar to the scheme in *Schmuck*.  *United States v. Tiller*, 302 F.3d 98, 100, 102 (3d Cir. 2002).  Furthermore, the Fifth Circuit, in *United States v. Mills*, relied principally upon *Schmuck* to conclude that the defendant, who wrongfully obtained funds from his company's bank account in Colorado and deposited them into his personal bank accounts in Texas, engaged in an "ongoing venture and not a 'one-shot' operation" that involved numerous checks over the course of at least thirteen months.[5]  199 F.3d 184, 187, 189–90 (5th Cir. 1999).  Finally,

---

[5] The *Mills* Court also recognized that the defendant's conduct fell within an exception set forth in *Kann*, discussed *infra*, namely that it was conceivable in some settings that the mere clearing of a check would be

the Seventh Circuit has also distinguished *Kann* by virtue of the fact that the decision predated the Uniform Commercial Code, "which ma[de] it easy for a customer's bank to reverse the credit if the instrument cannot be collected." *United States v. Franks*, 309 F.3d 977, 978 (7th Cir. 2002).

Even if we construe each check Jinian deposited as an individual, discrete scheme, *Kann* remains distinguishable. The Supreme Court recognized exceptions to the rule it announced in *Kann*: instances in which the mails—or, as here, interstate wires—are used as "a means of concealment so that further frauds which are part of the scheme may be perpetuated." 323 U.S. at 94. The *Kann* Court observed that, in such cases, "the mailing has ordinarily had a much closer relation to further fraudulent conduct than has the mere clearing of a check . . . ." *Id.* at 95. It also described as "conceivable" that the mere clearing of a check, "alone, in some settings, would be enough" to support a fraud conviction. *Id.*

Here, the mere clearing of a check is enough because the interstate communication was necessary to complete and conceal Jinian's fraud. The monies Jinian deposited into his Mechanics Bank account, unlike the monies involved in *Kann*, were not irrevocably his at the moment of deposit. Indeed, the monies did not belong to Jinian until the checks cleared through Silicon Valley Bank. Evidence introduced at trial showed that the interstate wire communications between Mechanics Bank and the Federal Reserve Bank in Dallas—and between the Federal Reserve Bank in Dallas and Silicon Valley Bank—were a necessary component of the

enough to confer federal jurisdiction under the wire fraud statute. *Mills*, 199 F.3d at 189.

check clearing process. Absent those wire communications through Dallas, Jinian's deposit was incomplete, and the monies were subject to hold or cancellation, *i.e.*, they were not irrevocably in his possession. Consequently, a rational jury could have concluded that the interstate wire communications among the three banks were "incident to the execution of," *Lo*, 231 F.3d at 478—rather than "merely incidental and collateral" to, *Kann*, 323 U.S. at 95—Jinian's scheme because they advanced and facilitated the deposit of monies into Jinian's account. *See Jackson*, 443 U.S. at 319.

The government also introduced evidence that Jinian directed Brown to issue multiple, smaller-denomination checks, rather than a large, lump-sum payment.[6] Such conduct gives rise to inferences that Jinian intended to conceal his transactions entirely from detection by Bricsnet or structure the transactions in a manner that gave them the appearance of regular or necessary business expenditures. Jinian's conduct further suggests that depositing multiple, smaller-denomination checks insulated his conduct from suspicion by or scrutiny from Mechanics Bank about large-sum deposits. Thus, a rational jury could have concluded that Jinian utilized the interstate wires to structure, perpetuate, and conceal his fraudulent scheme.

In short, having considered the principles set forth in *Kann* and *Schmuck*, we sustain Jinian's wire fraud conviction.

---

[6] For example, Jinian, on March 3, 2008, deposited two separate checks in the amounts of $17,500 and $15,500, rather than one check for $33,000. On April 4, 2008, Jinian deposited two separate checks in the amounts of $14,000 and $9,000, rather than one check for $23,000.

**B.**

Next, Jinian, interpreting 18 U.S.C. § 1343 to require that the government prove beyond a reasonable doubt that a defendant intended to use an *interstate* wire communication as part of a scheme to defraud, contends that the district court erred by failing to instruct the jury that the interstate component of a wire must be reasonably likely or foreseeable. The district court instructed the jury, in relevant part, as follows:

> With regard to each of these 14 counts, in order for the defendant to be found guilty . . . , the government must prove each of the following elements beyond a reasonable doubt:

> First, the defendant knowingly devised a scheme or plan to defraud or a scheme or plan for obtaining money by means of false or fraudulent pretenses, representations, or promises[.]

> . . . .

> Third, the defendant acted with the intent to defraud; that is, the intent to deceive or cheat[.] And fourth, the defendant used or caused to be used a wire communication in interstate commerce to carry out or attempt to carry out an essential part of the scheme.

> . . . .

>A wire fraud involves the use of wire in interstate commerce. An interstate wire communication includes a wire transmission so long as it goes across a state line.
>
>A wiring is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use. It does not matter whether the information wired was itself false or deceptive so long as the wire was used as part of the scheme, nor does it matter whether the scheme or plan was successful or that any money was obtained.
>
>An intent to defraud is an intent to deceive or cheat.

These jury instructions fairly and adequately covered the elements of wire fraud. *See Pelisamen*, 641 F.3d at 409; *Knapp*, 120 F.3d at 930.

While there is a presumption in favor of finding an intent requirement in each statutory element that criminalizes otherwise innocent conduct, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994), the Supreme Court has distinguished between proscribed conduct generally and conduct that falls within the scope of congressional regulation. Specifically, it explained that a "requirement is sufficient to confer jurisdiction on the federal courts for what otherwise are state crimes precisely because it implicates factors that are an appropriate subject for federal concern":

> The significance of labeling a statutory requirement as "jurisdictional" is not that the requirement is viewed as outside the scope of the evil Congress intended to forestall, but merely that the existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute. The question, then, is not whether the requirement is jurisdictional, but whether it is jurisdictional only.

*United States v. Feola*, 420 U.S. 671, 676 n.9 (1975). Here, the "fact that confers federal jurisdiction," *id.*, in 18 U.S.C. § 1343 is the interstate nexus: use of an interstate communication "is included in the statute merely as a ground for federal jurisdiction . . . . If the wire employed is an interstate wire the requirements for federal jurisdiction are satisfied." *United States v. Blassingame*, 427 F.2d 329, 330 (2d Cir. 1970). The interstate nexus is necessary, of course, "because Congress's power over intrastate activities is limited by the Commerce Clause." *United States v. Lindemann*, 85 F.3d 1232, 1241 (7th Cir. 1996). We therefore hold that the interstate requirement in 18 U.S.C. § 1343 is jurisdictional and not a substantive element of a wire fraud offense.

"Jurisdictional language need not contain the same culpability requirement as other elements of the offense." *United States v. Yermian*, 468 U.S. 63, 68 (1984). In light of our holding, the government is not required to prove under 18 U.S.C. § 1343 that the interstate nature of the wire was reasonably likely or foreseeable, *see Lindemann*, 85 F.3d at 1241, because the statute "does not condition guilt upon knowledge that interstate communication is used" and "use of

interstate communication is logically no part of the crime itself," *Blassingame*, 427 F.2d at 330; *see also United States v. Roselli*, 432 F.2d 879, 891 (9th Cir. 1970) (explaining that the purpose of statutes such as 18 U.S.C. § 1343 "argues against a construction making a specific 'anti-federal' intent an element of the offense").    As the Seventh Circuit recognized,

> it has consistently been held that for statutes in which Congress included an "interstate nexus" for the purpose of establishing a basis for its authority, the government must prove that the defendant knew he was involved in the wrongful conduct, but *need not prove that the defendant knew the "interstate nexus" of his actions*.

*Lindemann*, 85 F.3d at 1241 (emphasis added). It is therefore "wholly irrelevant to any purpose of the statute that the perpetrator of the fraud knows about the use of interstate communication." *Blasingame*, 427 F.2d at 330; *accord United States v. Bryant*, 766 F.2d 370, 375 (8th Cir. 1985) (explaining that 18 U.S.C. § 1343, "read literally, require[s] only that the wire communication *be* interstate, not that defendants *know* that it is to be interstate").

A specific intent to defraud is the only *mens rea* requirement under the wire fraud statute. *See United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984) (construing the mail fraud statute); *accord United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999) (construing the mail fraud statute and explaining that "[p]roof of fraudulent intent, or the specific intent to harm or defraud the victims of the scheme, is an essential component of the 'scheme to defraud' element").

The Supreme Court's decision in *Pereira v. United States*, which establishes that a defendant "causes" an interstate wire if he acts "with knowledge that the use of the [wire] will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended," 347 U.S. 1, 8–9 (1954), does not hold to the contrary.

Jinian's reliance upon *Fowler v. United States*, 131 S. Ct. 2045 (2011), which he contends supports his position that the government must prove he reasonably foresaw that an *interstate* wire communication—rather than a wire communication in general—would occur, is misplaced. At issue in *Fowler* was the federal witness tampering statute, which makes it a crime to kill—or attempt to kill—another person "with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the commission or possible commission of a Federal offense . . . ." 18 U.S.C. § 1512(a)(1)(C) (2006). Focusing upon instances where a defendant killed a person with an intent to prevent the victim from communicating with law enforcement officers generally but did not have federal law enforcement officers in mind, the Supreme Court addressed how the government needed to prove a federal nexus under the statute in order "to show that the defendant more particularly intended to prevent communication with *federal* officers as well." *Fowler*, 131 S. Ct. at 2048. Since it could not construe the witness tampering statute "as intending to excuse the Government from proving *something* about the hypothetical communication with federal officers," *id.* at 2051, the Supreme Court held that the government was required to show there was a reasonable likelihood that a relevant

communication would have been made to a federal officer,[7] *id.* at 2048. In other words, killing a victim with an intent to prevent communication with law enforcement officers generally includes "an intent to prevent communications with *federal* law enforcement officers only if it is reasonably likely under the circumstances that . . . at least one of the relevant communications would have been made to a federal officer."[8] *Id.* at 2052.

The *Fowler* Court adopted a foreseeability standard because the witness tampering statute addresses hypothetical communications. *See* 131 S. Ct. at 2049 ("Witness tampering may prove more serious (and more effective) when the crime takes place before the victim has engaged in any communication at all with law enforcement officers—at a time when the precise communication and nature of the officer who may receive it are not yet known."). The wire fraud statute, by contrast, requires an actual wire communication. Moreover, the *Fowler* Court's enunciation of a "reasonable likelihood" standard was directed toward the "broad indefinite intent," *id.* at 2050, set forth in 18 U.S.C. § 1512(a)(1)(C) that requires the likelihood of communication to a federal officer to be "more than remote, outlandish, or

---

[7] The government, however, need not show that the defendant intended to prevent a communication from reaching a law enforcement officer whom the defendant *knew* to be a federal officer because 18 U.S.C. § 1512(g)(2) provides that "no state of mind need be proved" with respect to the victim's status as a federal officer. *Fowler*, 131 S. Ct. at 2049.

[8] The "reasonable likelihood" standard the *Fowler* Court adopted reflected the shortcomings of a "mere possibility" standard that, it reasoned, would enable the government "to show little more than the *possible* commission of a federal offense." 131 S. Ct. at 2051 (emphasis added).

simply hypothetical," *id.* at 2052.  No such broad, indefinite intent exists in the wire fraud statute, which requires an intent to *defraud*, *see Bohonus*, 628 F.2d at 1172, not the intent to utilize an interstate wire communication, 18 U.S.C. § 1343. *Fowler*, therefore, is wholly inapposite.

We reject Jinian's arguments that his conviction should be overturned on the basis that there was insufficient evidence to prove his use of an interstate wire communication was reasonably foreseeable and the jury should have been instructed to find the same.  No *mens rea* requirement exists with regard to the jurisdictional, interstate nexus of Jinian's actions under 18 U.S.C. § 1343, which requires only that Jinian used—or caused the use of—interstate wires in furtherance of his scheme to defraud Bricsnet.  The government proved each element of wire fraud by introducing sufficient evidence for a reasonable jury to conclude that (1) Jinian devised a scheme with the specific intent to defraud Bricsnet, (2) it was reasonably foreseeable to Jinian that wire communications between Mechanics Bank and Silicon Valley Bank would be made in furtherance of his scheme, and (3) interstate wire communications actually occurred in furtherance of Jinian's scheme.  Accordingly, the district court properly instructed the jury and did not abuse its discretion by refusing to give Jinian's proposed jury instruction.

## C.

Finally, Jinian argues that the district court erred by denying his motion for judgment of acquittal because the wire fraud statute, as applied to his case, constitutes an improper exercise of congressional authority under the Necessary and

Proper Clause and violates the Tenth Amendment.  We reject these constitutional challenges.

The Necessary and Proper Clause "grants Congress broad authority to enact federal legislation."  *United States v. Comstock*, 130 S. Ct. 1949, 1956 (2010).  When determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a federal statute, courts examine whether "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  *Id.*

The wire fraud statute falls "within the extensive reach of the Commerce Clause," *United States v. Hook*, 195 F.3d 299, 310 (7th Cir. 1999), under which Congress may (1) "regulate the use of the channels of interstate commerce," (2) "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "regulate those activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce," *United States v. Lopez*, 514 U.S. 549, 558–59 (1995) (citation omitted); *accord Gonzales v. Raich*, 545 U.S. 1, 22 (2005) (recognizing that it is "of no moment" that Congress's valid regulation of interstate activity "ensnares some purely intrastate activity").  Wires are channels or instrumentalities of interstate commerce.  *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 271 (1964) ("The facilities and instrumentalities used to carry on . . . commerce, such as railroads, truck lines, ships, rivers, and even highways are also subject to congressional regulation . . . ."); *United States v. Carnes*, 309 F.3d 950, 954 (6th Cir. 2002) (recognizing that telecommunications are channels and instrumentalities of interstate commerce); *see*

*also United States v. Wright*, 625 F.3d 583, 594 (9th Cir. 2010) ("[O]ur precedent indicates that criminal statutes punishing the transmission of the relevant material 'in interstate or foreign commerce' require the material itself to cross state lines."). Accordingly, 18 U.S.C. § 1343 "is a valid extension of congressional power" under the Commerce Clause. *Hook*, 195 F.3d at 310.

Since Congress enacted 18 U.S.C. § 1343 based upon a constitutionally enumerated power, analysis of the statute under the Necessary and Proper Clause is inappropriate. *Gonzales*, 545 U.S. at 39 (explaining that the Necessary and Proper Clause "empowers Congress to enact laws in effectuation of its *enumerated powers that are not within its authority to enact in isolation*" (emphasis added) (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421–22 (1819))). Furthermore, because 18 U.S.C. § 1343 is a valid exercise of powers delegated to Congress by the Commerce Clause, Jinian's Tenth Amendment challenge fails. *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000) ("We have held that if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment.").

## IV.  CONCLUSION

We conclude that Jinian's fraudulent scheme closely resembles the fraud perpetrated in *Schmuck*, rather than the conduct at issue in *Kann*, and hold that the interstate requirement in 18 U.S.C. § 1343 is jurisdictional and not a substantive element of the wire fraud offense. We further

conclude that Jinian's constitutional challenges to the wire fraud statute are without merit. Accordingly, we affirm Jinian's conviction and sentence.

**AFFIRMED**.

CHRISTEN, Circuit Judge, concurring:

I concur with the majority opinion. I write separately to emphasize the attribute of Jinian's fraudulent scheme that is fatal to his argument that his crime was complete upon the deposit of each check into his account at Mechanics Bank.

When a perpetrator—like Jinian—conceives of an ongoing scheme to defraud, he is necessarily concerned with which party ultimately bears the loss; indeed, his ability to continue the scheme depends upon it. *See Schmuck v. United States*, 489 U.S. 705, 714 (1989). In contrast, one-time fraudsters are indifferent to who pays for their crimes, because they do not need to leave one party whole in order to avoid detection and swindle again. *See Kann v. United States,* 323 U.S. 88, 93–94 (1944). The *Schmuck* and *Kann* cases illustrate that when a perpetrator is indifferent to the ability to repeat the fraudulent scheme, the use of mail or wires *after* money or services are obtained cannot be "for the purpose of executing [that] scheme." *See* 18 U.S.C. § 1343. For federal wire fraud, the point at which this type of transaction is deemed "completed" is illustrated by comparing the facts in *Schmuck* with the facts in *Kann*.

*Schmuck* involved an "ongoing fraudulent venture": an automobile distributor turned back the odometers on used

cars before selling them to unsuspecting dealers.  The dealers resold the cars to consumers at inflated prices, using the mail to transfer title to their customers.  489 U.S. at 707.  Schmuck argued that his crimes were completed once he collected his money from the dealers, which was *before* the mail was used to transfer the titles.  *Id.* at 707–08.  But the Court explained that Schmuck fell within the bounds of the federal mail fraud statute because the scheme Schmuck envisioned required that the dealers could successfully re-sell the used cars and transfer titles to the new owners.  *Id.* at 712.  If the dealers had been unable to do so, they surely would not have agreed to continue doing business with Schmuck and his scheme likely would have been discovered.  *Id.* at 714.

In contrast, the federal prohibition on mail fraud was not triggered in the one-off scheme that took place in *Kann.* There, businessmen cashed or deposited fraudulently obtained checks and moved on, unconcerned about whether the drawee banks reimbursed the payee banks. *See* 323 U.S. at 94.    The *Kann* crimes were completed when the businessmen deposited or cashed their checks because the scheme they envisioned did not depend on who ultimately bore the loss.  *Id.*  The Court reached the same result in *Parr v. United States,* 363 U.S. 370 (1960), where two fraudsters used a school district credit card to buy gasoline and other services from a filling station.  Each fraudulent transaction was completed long before the credit card bill was mailed to the school district for payment.  *See id.* at 392–93. The *Parr* Court explained that it "was immaterial to [the perpetrators], or to any consummation of the scheme, how the [oil company] . . . would collect from the [District]."  *Id.* at 393 (quoting *Kann*, 323 U.S. at 94) (first alternation added, the remainder in *Parr*).

Jinian convinced an employee at Bricsnet that he had permission to receive funds in excess of his regular compensation. He obtained checks through this misrepresentation and deposited them into his account at Mechanics Bank. The ability to perpetuate his scam depended on his employer, not Mechanics Bank, bearing the loss. If Mechanics Bank had credited Jinian's account for any one of his fraudulently-obtained checks and the check had subsequently failed to clear Silicon Valley Bank (Bricsnet's bank), Mechanics Bank would have sustained the loss, and Jinian would have "jeopardized [his] relationship of trust and goodwill" with Mechanics Bank. *Schmuck*, 489 U.S. at 714. No doubt additional questions would have been asked that would have risked disclosure of Jinian's fraudulent operation. Because the ongoing nature of Jinian's scheme depended on every check clearing (so that Bricsnet bore the loss rather than Mechanics Bank), wiring the image of every check to the Federal Reserve in Dallas was "part of the execution of the scheme as conceived by [Jinian]." *Id.* at 715.

The majority and the district court rely on *United States v. Franks*, 309 F.3d 977, 978 (7th Cir. 2002), to conclude that Jinian's fraudulent transactions were not complete until the deposited checks cleared because the funds "were not irrevocably in his possession" until that time. Majority at 16. *Franks* stated that the deposit of fraudulently obtained checks should not determine the "completion" of a similar scheme to defraud because the adoption of the Uniform Commercial Code (after *Kann* was decided) made it easier for banks to recall deposited funds when checks fail to clear. *Id.* I agree with the conclusion that Jinian's transactions were not complete until clearance, but not because the funds were not irrevocably his before that time.

First, the record does not support the majority's statement that Jinian's funds were "subject to hold or cancellation" by Mechanics Bank until after the images of the checks were wired to the Federal Reserve. Majority at 16. No testimony was offered from employees at Mechanics Bank to establish when deposited funds were credited to customers' accounts and made available to them to withdraw. It is easy to envision that a bank customer like Jinian, with a large account balance and an active account, may have been given the courtesy of having access to funds in his account before the checks cleared via wire transfer to the Federal Reserve. Without knowing the specifics of Mechanics Bank's policies, we cannot know whether Mechanics Bank would have been able to recall, and thereby recover, Jinian's ill-gotten checks. Without this evidence, reliance on the reasoning in *Franks* is misplaced.

More to the point, the result of Jinian's case would not change even if Jinian had cashed the checks at Mechanics Bank, rather than depositing them, because *Schmuck* does not focus on retrievability. *Schmuck* instructs that the dispositive fact in wire and mail fraud cases such as this one is whether the fraud "*as conceived by the perpetrator* at the time" was complete before the intended victim suffered a loss. 489 U.S. at 715 (emphasis added). When the identity of the ultimate victim matters to the perpetrator's ability to repeat an ongoing scheme, the crime is not complete until the intended victim is swindled. Here, the wires to the Federal Reserve were "incident to an essential part of [Jinian's] scheme" because the wires—not Jinian's deposits to Mechanics Bank—ensured that it was Bricsnet's funds that were fraudulently obtained. *See Pereira v. United States*, 347 U.S. 1, 8 (1954).