**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAMES PHILIP LUCERO,
*Defendant-Appellant.*

No. 19-10074

D.C. No.
4:16-cr-00107-HSG-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted September 14, 2020
San Francisco, California

Filed March 4, 2021

Before: Bridget S. Bade and Patrick J. Bumatay, Circuit
Judges, and Rosemary Márquez,[*] District Judge.

Opinion by Judge Bumatay;
Partial Concurrence and Partial Dissent by Judge Bade

---

[*] The Honorable Rosemary Márquez, United States District Judge for the District of Arizona, sitting by designation.

**SUMMARY**[**]

---

**Criminal Law**

The panel reversed a conviction on three counts of knowingly discharging a pollutant in violation of the Clean Water Act, and remanded for a new trial, in a case in which the defendant orchestrated a scheme charging construction companies to dump dirt and debris on lands near the San Francisco Bay—sites that included "wetlands" and a "tributary" subject to the Act.

The panel held that the Act requires the government to prove that a defendant knew he was discharging material "into water," but need not prove that the defendant knew he discharged the pollutant in "to waters of the United States." The panel explained that the latter phrase is a jurisdictional element connecting the Clean Water Act to Congress's Commerce Clause powers. The panel held that the jury instructions failed to make clear the requirement that the defendant knew the pollutant was discharged "into water," and could not say that the error was harmless. The panel therefore reversed the conviction and remanded for a new trial with jury instructions that make clear the government's burden to prove that the defendant knowingly discharged fill material "into water."

The panel held that the regulation defining "waters of the United States" at the time of the defendant's trial is not unconstitutionally vague. The panel explained that although

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the definitions are complex, they provide an ascertainable standard for when "wetlands" and "tributaries" constitute jurisdictional waters.

The panel held that a newly promulgated 2020 regulation that substantially narrowed the definition of "waters of the United States" represents a change in the law that does not apply retroactively.

Dissenting in part, Judge Bade joined the majority's opinion except as to the sections that conclude that the reference to "waters of the United States" is a purely jurisdictional element and therefore not subject to the "knowingly" mens rea requirement.

## COUNSEL

Angela M. Hansen (argued) and Robin Packel (argued), Assistant Federal Public Defenders; Steven G. Kalar, Federal Public Defender; Office of the Federal Public Defender, Oakland, California; for Defendant-Appellant.

David Gunter (argued) and John L. Smeltzer, Attorneys; Eric Grant, Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

Norman D. James, Fennemore Craig P.C., Phoenix, Arizona; Thomas J. Ward, National Association of Home Builders, Washington, D.C.; for Amicus Curiae National Association of Home Builders.

Anthony L. François and Jonathan Wood, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Chantell and Michael Sackett, Duarte Nursery Inc., John Duarte, Roger J. Lapant Jr., Oregon Cattlemen's Association, and Washington Cattlemen's Association.

## OPINION

BUMATAY, Circuit Judge:

Most Americans would be surprised to learn that dry land might be treated as "navigable waters" under the Clean Water Act. Yet that's just the oddity we face here. James Lucero orchestrated a scheme charging construction companies to dump dirt and debris on lands near the San Francisco Bay. As it turns out, these sites actually included "wetlands" and a "tributary" subject to the Act. Accordingly, Lucero was charged with three counts of knowingly discharging a pollutant in violation of the Act. *See* 33 U.S.C. §§ 1319(c)(2)(A); 1311(a). A jury found him guilty on all counts.

Lucero brings this appeal, raising a number of arguments for why his conviction should be reversed. Although we reject most of his contentions, we agree that reversal and remand is nevertheless required. The Act requires the government to prove a defendant knew he was discharging material "into water." *Id.* § 1362(6). Because the jury instructions failed to make this knowledge element clear, and the error was not harmless, we reverse Lucero's conviction and remand for a new trial.

## I.

## A.

Some regulatory background is in order first.  In 1972, Congress passed the Clean Water Act, which, among other things, criminalizes the discharge of pollutants into "navigable waters" without an appropriate permit.  *See* 33 U.S.C. §§ 1311(a), 1362(12), 1344.  Lucero doesn't dispute that he engaged in the discharge of dirt and debris, that such material constitutes a "pollutant" under the Act, and that he did not have the requisite permit.  Instead, his appeal centers on the "navigable waters" element of the statute.

That phrase, though it might seem straightforward on its face, is complicated by its statutory definition: "The term 'navigable waters' means the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7). Responsibility for deciding what constitutes "waters of the United States"—also referred to as jurisdictional waters— rests with two federal agencies: the Environmental Protection Agency ("EPA") and the Army Corps of Engineers.  *See* 33 C.F.R. § 328.3 (2014).  They define the contours of this phrase by promulgating regulations listing the types of water features that qualify as waters of the United States.  At the time of Lucero's conduct in 2014, the regulation included two types of jurisdictional waters at issue here: (1) "[t]ributaries" of certain other waters of the United States; and (2) wetlands adjacent to other waters of

the United States (that are not themselves wetlands). *See id.* § 328.3(a)(5), (7) (2014).[1]

The expansive regulatory definition of "waters of the United States" was reined in somewhat after the Supreme Court's fractured decision in *Rapanos v. United States*, 547 U.S. 715 (2006). Justice Scalia's plurality opinion held that water of the United States "includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, . . . oceans, rivers, and lakes," and "wetlands with a continuous surface connection to bodies that are waters of the United States in their own right." *Id.* at 739, 742 (plurality) (quotation marks and citation omitted). Justice Kennedy wrote a concurrence in which he set out a much broader interpretation: wetlands adjacent to navigable-in-fact waters and even wetlands adjacent only to nonnavigable tributaries could be considered jurisdictional waters if there is a "significant nexus" between the wetlands and traditionally navigable waters. *Id.* at 779–82 (Kennedy, J., concurring). We later adopted Justice Kennedy's test as our own. *N. Cal. River Watch v. City of Healdsburg* ("*Healdsburg*"), 496 F.3d 993, 999–1000 (9th Cir. 2007).

Since Lucero's offense in 2014, the agencies have gone through several different iterations of the "waters of the

---

[1] The regulation also includes (1) waters that are, have been, or could be used "in interstate or foreign commerce"; (2) all interstate waters; (3) all "other waters" whose "use, degradation or destruction" could "affect interstate or foreign commerce"; (4) all "impoundments" of other jurisdictional waters; and (5) the "territorial seas." 33 C.F.R. § 328.3(a)(1)–(4), (6) (2014).

United States" regulation.    The current regulation was promulgated in April 2020.  *See* 33 C.F.R. § 328.3 (2020).

**B.**

Lucero executed his dumping scheme near the San Francisco Bay during the summer months of July and August 2014, which is the "hot and dry" season even in a normal year.  And 2014 was not a normal year—the area was suffering from a long-term drought.  Although there was evidence that Lucero had "walked the land" with a business associate at the end of May 2014, the record is bereft of evidence about the condition of the land at that time or evidence about whether Lucero would have known that the sites were inundated with water, rather than dry land.

Needless to say, these areas did not consist of waters that are actually navigable-in-fact.  Rather, application of the Clean Water Act—and thus, whether the statute was violated—depended on whether the sites met the regulatory definition of "waters of the United States."  The government based its theory for the three areas on their connection to the Mowry Slough, which is undisputedly a navigable "water of the United States" near the San Francisco Bay.

The government charged Lucero with two counts based on discharges into "wetlands" adjacent to the Mowry Slough.  Both of these sites were separated from the slough by a levee made of packed dirt "to keep water in or out."  The government also presented evidence that there was a direct hydrological connection between these two wetlands and the Mowry Slough.  For the first wetland site, the government presented evidence that the area was connected to a tributary ("Tributary 1"), which flowed underneath the levee into the slough.  For the second wetland site, the government's experts showed that water flowed from the site through a

series of tributaries, which ultimately converged into the slough.

The government's third charge was based on dirt and debris dumped into Tributary 1, which was itself a separate "water of the United States" as a "[t]ributary" of the Mowry Slough. *See* 33 C.F.R. § 328.3(a)(5) (2014). Tributary 1 was not navigable, and government experts testified that its flow was "seasonal."

A jury convicted Lucero on all three counts, and this appeal followed. We review each of his legal claims de novo. *See United States v. Weitzenhoff*, 35 F.3d 1275, 1283 (9th Cir. 1993).[2]

## II.

Lucero first argues that the jury instructions used to convict him erroneously omitted the Clean Water Act's knowledge element. Second, he argues that the definition of "waters of the United States" is unconstitutionally vague. Finally, Lucero argues that the 2020 regulatory definition of "waters of the United States" should apply retroactively to his case. While we reject the latter two claims, we agree with Lucero that the Act requires a knowledge element not submitted to the jury and that he is entitled to a new trial.

---

[2] In a concurrently filed memorandum disposition, we address Lucero's other arguments that the district court committed various trial errors by allowing certain expert testimony, excluding a declaration from an EPA agent, and refusing to give the jury instruction he requested.

## A.

We first address the knowledge requirement of 33 U.S.C. § 1319(c)(2)(A), whether it was adequately conveyed by the jury instructions, and whether any error was harmless.

## 1.

Section 1319(c) creates criminal penalties for violation of the Clean Water Act. 33 U.S.C. § 1319(c). In particular, § 1319(c)(2)(A) makes it a felony for anyone to "knowingly violate[] section 1311" of the Act. *Id.* § 1319(c)(2)(A). Section 1311, in turn, provides that "the discharge of any pollutant by any person shall be unlawful" without a permit. *Id.* § 1311(a). When the word "knowingly" precedes the verb "violate," it applies to the verb's direct object, which in this case is § 1311. *See Rehaif v. United States*, 139 S. Ct. 2191, 2195 (2019). So if we stopped here, this statutory structure indicates that a person simply needs to "knowingly" "discharge . . . any pollutant" without a permit to be found guilty of the crime.

But like Russian nesting dolls, the statutory definitions keep going:

- The phrase "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

  o The word "pollutant" is defined as one of multiple enumerated substances, such as dredged spoil or

        solid waste, "discharged into water." *Id.* § 1362(6).**[3]**

o   The term "navigable waters" is defined as "waters of the United States." *Id.* § 1362(7).

o   "Point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, . . . from which pollutants are or may be discharged." *Id.* § 1362(14).

Stringing together these definitions gives us a statute that prohibits any person from "knowingly" engaging in the "addition of any" listed substance "discharged into water"

---

**[3]** The full definition of "pollutant" is "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). We read the phrase "discharged into water" as applying to all the enumerated substances in the list. Under the series-qualifier canon, "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a . . . postpositive modifier normally applies to the entire series." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012); *see also United States v. Deaton*, 209 F.3d 331, 335 (4th Cir. 2000) ("The definition of pollutant, in turn, specifically includes 'dredged spoil' that has been 'discharged into water.'"); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1410 (D.C. Cir. 1998) (Silberman, J., concurring) ("But rock and sand only become pollutants, according to the statute, once they are 'discharged into water.'"); *United States v. Pozsgai*, 999 F.2d 719, 725 (3d Cir. 1993) ("The Act defines 'pollutant' to mean 'dredged spoil, rock, sand' and other materials 'discharged into water[.]'").

"to waters of the United States" "from any point source." 33 U.S.C. §§ 1319(c)(2)(A), 1311(a), 1362(6), (7), (12). Notably, as the Third Circuit recognized, the Act creates an "apparent redundancy" because "into water" and "to waters of the United States" appear together back-to-back. *United States v. Pozsgai*, 999 F.2d 719, 726 (3d Cir. 1993). The question then becomes how the phrases "into water" and "to waters of the United States" "co-exist in this definition." *Id.*[4]

The parties offer competing views on how the court should resolve this tension. Lucero essentially asks us to read out the phrase "discharged into water" from the statutory definition of pollutant. In his view, "knowingly" must then reach the phrase "to waters of the United States" as the prepositional phrase modifying "addition of any pollutant," and the government must prove his knowledge of that element. The government urges us to give effect to both phrases—"into water" and "to waters of the United States"—by treating the former as the prepositional phrase modifying "addition of any pollutant" and the latter as a jurisdictional element. Under the government's view, the knowledge requirement only extends to "into water."

We think the correct interpretation of the Clean Water Act supports the government's position. First, we are unwilling to simply read out the phrase "discharged into water" from the definition of "pollutant." 33 U.S.C. § 1362(6). Indeed, "to ignore the plain text" of a statute is "something we are not at liberty to d[o]." *In re DBSI, Inc.*,

---

[4] The Third Circuit answered the question by simply ignoring the "into water" part of the "pollutant" definition. *See Pozsgai*, 999 F.2d at 726–27 & n.7. The court, in essence, treated the term "to navigable waters" from § 1362(12) as modifying the term "discharged into water" from § 1362(6). As explained below, we disagree with this analysis.

869 F.3d 1004, 1013 (9th Cir. 2017). Even when the law includes unusual or mismatched provisions, "[o]ur task is to apply the text, not to improve upon it." *Pavelic & LeFlore v. Marvel Entm't Grp.,* 493 U.S. 120, 126 (1989). After all, we have "no roving license" to disregard statutory text to make our jobs easier in interpreting it. *Michigan v. Bay Mills Indian Cmty.,* 572 U.S. 782, 794 (2014).

The "apparent redundancy" can also be readily explained by the "distinctive role interstate commerce elements play in federal criminal law." *Luna Torres v. Lynch*, 136 S. Ct. 1619, 1624 (2016). In our federal system, Congress cannot punish crimes generally, but must tie criminal law to "one of its constitutionally enumerated powers, such as the authority to regulate interstate commerce." *Id*. As a result, most federal offenses consist of both "substantive elements" and "a jurisdictional one," which "spell[s] out the warrant for Congress to legislate." *Id*. Sometimes it can be difficult to discern the difference between the two, but the Court has explained that substantive elements are those that "primarily define[] the behavior that the statute calls a violation of federal law," or relate to "'the harm or evil' the law seeks to prevent." *Id*. (alteration in original) (internal quotation marks and citations omitted). Jurisdictional elements, on the other hand, "do not describe the evil Congress seeks to prevent, but instead simply ensure that the Federal Government has the constitutional authority to regulate the defendant's conduct (normally, . . . through its Commerce Clause power)." *Rehaif*, 139 S. Ct. at 2196 (quoting *Luna Torres*, 136 S.Ct. at 1630–31). In other words, a jurisdictional element is one that identifies "the factor that makes the [conduct] an appropriate subject for federal concern," *United States v. Yermian*, 468 U.S. 63, 68 (1984), or the "'fact that confers federal jurisdiction,'" *United States*

*v. Jinian*, 725 F.3d 954, 965 (9th Cir. 2013) (quoting *United States v. Feola*, 420 U.S. 671, 676 n.9 (1975)).

In enacting the Clean Water Act, Congress wanted to pass the broadest possible protections against water pollution. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985). The Act's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act is "an all-encompassing program of water pollution regulation." *Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981). And the phrase "into water" supports its statutory objective by broadly proscribing the dumping of pollutants "into" any "water" from any conveyance. *See Riverside Bayview*, 474 U.S. at 133 (holding that "Congress chose to define the waters covered by the Act broadly."). Put differently, the phrase tells us *where* the "pollutant" must be added to constitute the evil—water pollution—that Congress sought to prevent through the Clean Water Act: from a point source "into water." Consequently, the phrase "into water" is an integral part of § 1311(a)'s substantive prohibition. *Cf. County of Maui v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1481 & n.3 (2020) (Thomas, J., dissenting) (doubting that the Act would be violated if a substance was discharged into "the air" based on definition of "pollutant").

The phrase "to waters of the United States," on the other hand, is a jurisdictional element, connecting the Clean Water Act to Congress's Commerce Clause powers. Because Congress's authority does not extend to every "water" in the United States, the Act includes a jurisdictional hook to confine it to the federal government's constitutional boundaries. As the Fourth Circuit recognized, "'[w]aters of the United States' in the [Act] is a classic jurisdictional element, which situates Congress' authority to enact the

statute in 'its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made.'" *United States v. Cooper*, 482 F.3d 658, 664 (4th Cir. 2007) (quoting *Solid Waste Agency of N. Cook Cty v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 172 (2001)); *see also Rapanos*, 547 U.S. at 724 (plurality) (observing that the agencies "sought to extend the definition of 'the waters of the United States' to the outer limits of Congress's commerce power"). Thus, the Act's explicit goal is to protect water in the United States as expansively as possible, and the "to waters of the United States" element is the "fact that confers federal jurisdiction." *Jinian*, 725 F.3d at 965.

Once fully understood then, the Clean Water Act's apparent redundancy is harmonized. Section 1311(a) has both a substantive prohibition (the addition of pollutants "into water" from a point source) and a jurisdictional hook (limiting that water to "waters of the United States."). While not the most artfully drafted legislation, in our view, no reason exists to depart from its plain language or to judicially excise some of its words.

From here, the question of how far the Act's knowledge element extends is straightforward. First, under plain grammatical rules, it's clear that § 1319(c)(2)'s knowledge requirement must extend to § 1311(a)'s substantive elements, including "into water." *See* 33 U.S.C. §§ 1319(c)(2)(A), 1311(a), 1362(6), (12). "In ordinary English, where a transitive verb has an object, listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence." *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009). Put another way, "once ['knowingly'] is understood to modify the object of those

verbs, there is no reason to believe it does not extend to the phrase which limits that object[.]" *Id.* at 657 (Scalia, J., concurring).[5] Here, the statutory phrase forms a single action: the "addition of any" enumerated substance "discharged into water" from a point source. *See* 33 U.S.C. §§ 1311(a), 1362(6), (12) (emphasis added). Accordingly, for a defendant to "knowingly" add a pollutant in violation of the Act, he must know that he discharged an enumerated substance from a conveyance, and that the substance was "discharged into water." *Id*. § 1362(6).

This interpretation also accords with the longstanding presumption that criminal statutes require knowledge of the statutory elements that "'criminalize otherwise innocent conduct.'" *Rehaif*, 139 S. Ct. at 2195 (quoting *United States v. X-Citement Video, Inc.,* 513 U.S. 64, 72 (1994)); *see also Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015). The statutory definition of "pollutant" contains a long list of substances, such as sand and rocks, which are not inherently wrongful to discharge in the abstract. 33 U.S.C. § 1362(6). But when these seemingly innocuous substances are added from a point source to water—regardless whether it is navigable water—then the discharge creates water pollution. After all, "[v]irtually all water, polluted or not, eventually makes its way to navigable water." *Hawaii Wildlife Fund*,

---

[5] The phrase "into water" is not the object of the verbal form of "addition"; it is a prepositional phrase. But in any event, the rationale of *Flores*—that an adverb ordinarily tells the listener how the "entire action" was performed—applies with equal force to this prepositional phrase. Indeed, *Flores* itself offered a hypothetical involving a prepositional phrase. *See* 556 U.S. at 650 ("[I]f a bank official says, 'Smith knowingly transferred the funds to his brother's account,' we would normally understand the bank official's statement as telling us that Smith knew the account was his brother's.").

140 S. Ct. at 1470.[6]   Thus, requiring knowledge of the defendant's dumping of the substance "into water" from a point source ensures that he knows he's committing the crime targeted by Congress—water pollution.

On the other hand, when it comes to jurisdictional elements, "the default rule flips: Courts assume that Congress wanted such an element to stand outside the otherwise applicable *mens rea* requirement." *Luna Torres*, 136 S. Ct. at 1631.  That's because "jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct[.]"  *Rehaif*, 139 S. Ct. at 2196.  Lucero suggests that dumping into "navigable waters" is (at least partly) the criminalized conduct and, thus, the knowledge requirement should apply to it.  But nothing in the Clean Water Act indicates that Congress was only concerned about the welfare of "navigable waters" as opposed to the country's waters as a whole.  In fact, Congress expressly stated its goal to protect the "integrity of the Nation's waters" in general while recognizing the States' role in achieving this goal.  *See* 33 U.S.C. §§ 1251(a)–(b).  Thus, neither the Clean Water Act's text nor stated purpose suggests that Congress wanted only discharges into "navigable waters" to be "in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *Feola*, 420 U.S. at 676 n.9 (defining when an element becomes substantive for purposes of a knowledge

---

[6] The concern for water pollution is not new.  At common law, "[b]y far the most commonly used doctrines protecting surface water quality are riparian rights and nuisance."  Peter N. Davis, Federal and State Water Quality Regulation and Law in Missouri, 55 Mo. L. Rev. 411, 484 (1990); *see also* Roger Meiners & Bruce Yandle, Common Law and the Conceit of Modern Environmental Policy, 7 Geo. Mason L. Rev. 923, 938–41 (1999) (describing development of riparian rights at common law).

requirement).[7]  We think the better reading of the statute is to recognize Congress's broad concern for water pollution and limit "waters of the United States" to its jurisdictional moorings.

In sum, the government need not prove that the defendant knew he discharged the pollutant in "to waters of the United States."  Instead, the knowledge requirement imposed by § 1319(c)(2)(A) compels the government to prove only that a defendant knew he discharged a substance "into water."

**2.**

Our dissenting colleague raises thoughtful critiques to our approach, and we agree that this statute is not a model of clarity.  Ultimately, however, we do not believe the dissent's critiques can carry the day.

The dissent primarily argues that our interpretation of the statute would be absurd because treating the phrase "discharged into water" as part of § 1319(c)'s substantive prohibition would mean that the CWA criminalizes "all sorts of innocent acts," like "heating a tea kettle," "using the restroom," or "skipping a rock across a pond."  *See* Dissent at 36.  Our dissenting colleague also believes that our interpretation is both *underinclusive* and *overinclusive* of the

---

[7] Likewise, the government refers to the term "waters of the United States" as "jurisdictional waters." *See, e.g.*, 33 C.F.R. § 328.3(a) (2020); Clean Water Rule: Definition of "Waters of the United States", 80 Fed. Reg. 37054-01, 37057 (June 29, 2015) ("In this final rule, the agencies define 'waters of the United States' to include eight categories of jurisdictional waters.").

outcomes the CWA is supposed to prohibit. *Id*. at 36, 41. We disagree with all these points.

As a threshold matter, we have not seen the absurdity canon applied in the manner the dissent suggests. For one, we've never seen the canon used to determine whether an element is jurisdictional. More fundamentally, though, our dissenting colleague takes our reading of the knowledge requirement of *three words* in the statute, ignores the rest of the law, and then declares our interpretation absurd. But that is not how we read statutes and that is not how the absurdity canon was meant to be applied. As the Supreme Court has reminded us, this canon is to be employed sparingly. The absurdity doctrine will "override the literal terms of a statute only under rare and exceptional circumstances." *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930). "[T]o justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common sense." *Id*. "[O]therwise, we might be rewriting the statute rather than correcting a technical mistake." *X-Citement Video*, 513 U.S. at 82 (Scalia, J., dissenting).

We think this means, at a minimum, that the absurdity canon should only be used to evaluate the statute in context—not myopically focusing on a single three-word phrase and then declaring freedom from the legislative text because of that phrase's absurd results. Indeed, "no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 153 (2012). Employing the absurdity canon in this way—devoid of the context of the statute—comes dangerously close to judicially creating a "roving license" to

just strike troublesome or disfavored statutory text. *Bay Mills*, 572 U.S. at 794.[8]

Moreover, § 1319, in context, leads to no absurdity whatsoever. While we read the Act as requiring knowledge of the pollutant being "discharged into water," such as ponds, lakes, streams, and maybe even a kettle of tea, that is only *one part* of the statute. Construing "water" in context with the Act's other elements, especially the requirement that any discharge be from a "point source," ensures that the CWA criminalizes only those activities falling within "reasonable notion[s] of water pollution." *See* Dissent at 36. A defendant only violates the Act if he knowingly discharges a pollutant into water from a conveyance, such as a "pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft." *See* 33 U.S.C. § 1362(14). This effectively requires that the "water" involved be an equivalent to a body of water, not simply a droplet of $H_2O$ as the dissent thinks. Reading these two phrases together therefore eliminates the possibility that heating tea kettles, skipping rocks, using the restroom, and the other parade of horribles imagined by the dissent would come within the CWA's ambit. *See* Dissent at 36.[9] Instead,

---

[8] Our dissenting colleague draws on *Holy Trinity Church v. United States*, 143 U.S. 457 (1892) for support. Dissent at 37. But the approach taken in that case has long been disfavored. *See* Antonin Scalia, A Matter of Interpretation 18 (1997) (describing *Holy Trinity* as the "prototypical case involving the triumph of supposed 'legislative intent' (a handy cover for judicial intent) over the text of the law").

[9] Indeed, looking at the CWA without context would render our dissenting colleague's interpretation absurd as well. If we were to ignore the point-source element as the dissent does, that interpretation would mean that skipping rocks at the beach or swimming in the ocean would

the best and most natural way to read the provision is that it prohibits polluting our Nation's waters by way of conveyances—i.e., water pollution. As a result, the dissent's charge of an absurd "overinclusiveness" falls flat; even without the jurisdictional element, our reading of the CWA doesn't extend to innocuous acts. Accordingly, read in light of the full statute, the CWA's prohibition as "mandated by its plain language is not absurd at all, much less sufficiently absurd to justify departure from a plain words interpretation." *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1099 (9th Cir. 2007).

The dissent also faults our interpretation for being "underinclusive" because the term "water" alone might not cover pollution of "arroyos, areas adjacent to water, or other dry areas" that would constitute "waters of the United States." *See* Dissent at 41 (citing Oxford English Dictionary). But the Supreme Court has expressly called it a "simplistic response" to look only to the "conventionally identifiable" definition of waters in light of "the realities of the problem of water pollution that the Clean Water Act was intended to combat." *Riverside Bayview*, 474 U.S. at 131–32. The Supreme Court long ago observed that "the transition from water to solid ground" is "far from obvious." *Id*. at 132. Rather, "between open waters and dry land" exists "a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land." *Id*. at 132; *see also Rapanos*, 547 U.S. at 740 (plurality) (discussing the

violate the law. *See* 33 U.S.C. § 1362(7) (defining "navigable waters" to include the "territorial seas"). Under that reading, hundreds of thousands of vacationers would be in legal jeopardy every summer. Of course, that would be an absurdity. But, in context of the whole statute, the law does no such thing. Accordingly, this misplaced absurdity exercise doesn't justify the dissent's extension of the mens rea requirement to the "waters of the United States" element.

"inherent ambiguity in drawing the boundaries of any 'waters'"). Accordingly, the Court has held that the broader term "waters" reasonably includes the narrower term "waters of the United States." *Riverside Bayview,* 474 U.S. at 132–33 (granting deference to agency's definition of *waters* based on "evident breadth of congressional concern for protection of water quality and aquatic ecosystems"). Nothing in our opinion forecloses "arroyos, areas adjacent to water, or other dry areas," *see* Dissent at 41, from being treated as "water" under 33 U.S.C. § 1362(6).[10]

Finally, while the dissent recognizes that "waters of the United States" is jurisdictional, it nevertheless declines to apply the default presumption that mens rea does not apply to such elements. *See Luna Torres,* 136 S. Ct. at 1631 ("Courts assume that Congress wanted [a jurisdictional] element to stand outside the otherwise applicable *mens rea* requirement."). Notably, the dissent fails to identify any other case, and we have found none, holding that a demonstrably jurisdictional element is in fact something more—thus, requiring mens rea. It appears, then, that the dissent would have us be the first to so hold.

\* \* \*

We agree with the dissent that jurists of good faith can disagree with the meaning of the CWA here. Dissent at 45. But we believe that the weight of precedent and the traditional canons of statutory interpretation require us to hold that the knowledge requirement of § 1319(c)(2)(A)

---

[10] Tellingly, we are adopting the government's position here. The government has the greatest interest in ensuring the ability to prosecute cases under the CWA and it does not share the dissent's concern.

extends only to "discharge into water" as part § 1311's prohibition, not to "waters of the United States."

**3.**

With assurances that we have the proper understanding of the statute's knowledge requirement, we now turn to whether the jury was properly instructed, and if not, whether that error was harmless. We look to "the instructions as a whole" to determine if the substance of the law was "fairly and correctly covered." *Dang v. Cross*, 422 F.3d 800, 805 (9th Cir. 2005) ((internal quotation marks and citations omitted). The government bears the burden of proving beyond a reasonable doubt that the error was harmless. *United States v. Benamor*, 937 F.3d 1182, 1190 (9th Cir. 2019).

The jury instructions listed the following elements:

(1) That on or about the dates charged, the defendant knowingly discharged or caused to be discharged a pollutant, in this case, fill material;

(2) That the pollutant was discharged from a point source;

(3) That the discharge was to a "water of the United States;" and

(4) That the defendant had no permit from the United States Army Corps of Engineers to discharge the pollutant.

Nowhere do these instructions state that Lucero had to know that the pollutant was discharged "into water." The

only knowledge requirement is with respect to the first element: the discharge of a pollutant, in this case, fill material. Although the jury instructions elsewhere define "fill material" as "material placed in 'waters of the United States,'" this definition is found five pages away, and the instructions do not indicate that Lucero had to know the material was placed in "waters of the United States" to meet the definition of fill material. The instructions also explicitly say that "the government is *not* required to prove that defendant knew that the material came within the legal definition of 'pollutant.'" So the most straightforward reading of the instructions is that the jury needed to find only that Lucero knowingly discharged the fill material—not that he knew the fill material was added "into water." As explained above, this erroneously omits the statute's mens rea element.

Nor can we say this was harmless error. Under harmless error analysis, courts may affirm a conviction, even if based on erroneous jury instructions, where it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error[.]" *Neder v. United States*, 527 U.S. 1, 18 (1999). Before we do so, however, we demand "strong and convincing evidence" that the jury would have reached the same result even if it had been properly instructed. *United States v. Alferahin*, 433 F.3d 1148, 1158 (9th Cir. 2006) (citations omitted). When the evidence relating to the omitted element is "neither overwhelming nor uncontested," the error is not harmless. *United States v. Montoya-Gaxiola*, 796 F.3d 1118, 1125 (9th Cir. 2015).

The record evidence that Lucero knew he discharged into water is both underwhelming and contested. Although there is evidence about the wet conditions and wetland-loving

vegetation in the area where Lucero dumped the dirt and debris, the site's conditions fluctuated depending on whether it was the wet or dry season—and Lucero dumped during the dry season following a drought.  The only evidence that related specifically to Lucero was testimony that he "walked the land" with an associate towards the end of May 2014.  But there is no indication of what the land looked like at the time, or whether this walk would have revealed to Lucero that the area was inundated with water rather than simply dry land.  Finally, Lucero made an offer of proof in case the district court adopted his requested knowledge instruction. *See United States v. Nordby*, 225 F.3d 1053, 1061 n.6 (9th Cir. 2000) (recognizing that the court "look[s] to the trial record and [the defendant's] representations on appeal" about what evidence he would have adduced regarding the omitted element), *overruled on other grounds by United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002).  This evidence included expert testimony, testimony from local police, and statements from federal officials about the difficulty involved in identifying this area as a wetland. Lucero also would have presented photographs of the sites, which he claims show them to be dry without visible signs of water.

On this record, we cannot say that a properly instructed jury clearly would have found Lucero guilty.  We therefore reverse Lucero's conviction and remand for a new trial with jury instructions that make clear the government's burden to prove that Lucero knowingly discharged fill material "into water."

**B.**

Lucero also argues that the definition of "waters of the United States," especially the meaning of "wetlands" and "tributaries," is unconstitutionally vague.  We disagree.

A criminal law can be void if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This is true regardless of whether the crime is codified in a statute or a regulation. *See United States v. Elias*, 269 F.3d 1003, 1015 (9th Cir. 2001). But a law is not unconstitutionally vague simply because it is difficult to determine whether it has been violated in a particular case. Instead, there must be an unreasonable amount of indeterminacy or subjectivity regarding what is even being prohibited in the first place. *See United States v. Williams*, 553 U.S. 285, 306 (2008); *see also Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (explaining that statute criminalizing "annoying" others was "vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all").

Likewise, in considering vagueness challenges, we must acknowledge that, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *see also Williams*, 553 U.S. at 304 ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict [First Amendment] expressive activity," which is subject to a heightened vagueness standard) (citation omitted). For this reason, we consider the extent to which a more definite law is simply not possible. *Kolender v. Lawson*, 461 U.S. 352, 361 (1983) ("Although due process does not require impossible standards of clarity, this is not a case where further precision in the statutory language is either impossible or impractical.") (internal quotation marks and citations omitted). A law may be "marked by flexibility and reasonable breadth, rather than meticulous specificity,"

but it will not be void for vagueness if "it is clear what the ordinance as a whole prohibits." *Grayned*, 408 U.S. at 110 (internal quotation marks and citations omitted).

Applying these principles to the Clean Water Act, we hold that the regulation defining "waters of the United States" at the time of Lucero's trial is not unconstitutionally vague. Although the definitions are complex, they nevertheless provide an ascertainable standard for when "wetlands" and "tributaries" constitute jurisdictional waters.[11]

### 1.

Take wetlands first. An area is classified as "wetlands" when inundated with water "at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions," such as "swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b) (2014). Such wetlands become "waters of the United States" when "adjacent"—meaning, "bordering, contiguous, or neighboring"—to other jurisdictional waters. *Id.* § 328.3(a)(7), (c). Although it may be time-consuming, difficult, and expensive to determine whether a given area falls within this definition, the standard for making this determination is nevertheless clear. "That close cases may arise in *applying* this test does not make it unconstitutional, given there will always be an inherent but permissible degree of uncertainty in applying any standards-based test."

---

[11] We analyze whether the law defining jurisdictional waters is vague as construed by the Court's decision in *Rapanos*. *See United States v. Lanier*, 520 U.S. 259, 266 (1997) (holding that courts should look to prior judicial decisions interpreting a statute in considering whether it is vague).

*Yamada v. Snipes*, 786 F.3d 1182, 1190–91 (9th Cir. 2015) (emphasis added).

Lucero's vagueness challenge centers on the concept of "adjacency."[12] He contends that the law was made unconstitutionally vague in light of Justice Kennedy's concurrence in *Rapanos*. Justice Kennedy explained that wetlands must, either "alone or in combination with similarly situated lands in the region," have a "significant nexus" to traditionally navigable waters to qualify as jurisdictional waters under the Act. *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring).[13] Justice Kennedy further

---

[12] Lucero focuses much of his argument on the fact that the Court has struggled to define when wetlands can constitute jurisdictional waters, particularly in the fractured opinions from *Rapanos*. But the disagreement in *Rapanos* did not arise because the law was hopelessly vague. Rather, it arose because of competing views about the proper scope of the regulations in light of the statutory text, the Commerce Clause, and federalism principles. *Rapanos*, 547 U.S. at 731, 737–38 (plurality); *id.* at 776–77, 782–83 (Kennedy, J., concurring); *id.* at 803–04 (Stevens, J., dissenting).

[13] Lucero and amici argue that the regulation's vagueness is compounded by the confusion about which opinion in *Rapanos* controls—Justice Scalia's plurality or Justice Kennedy's concurrence. They are correct that, after *United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016) (en banc), our caselaw regarding how to read a fractured Court opinion has shifted. We now look to the "narrowest" opinion by reasoning rather than results. *Id.* at 1021.

But we need not determine here which opinion in *Rapanos* controls in light of *Davis*. The "touchstone [of the vagueness inquiry] is whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal." *Lanier*, 520 U.S. at 267 (emphasis added). At the time of Lucero's offense, there was no confusion in the Ninth Circuit: we had squarely adopted Justice Kennedy's concurrence as controlling. *See Healdsburg*, 496 F.3d at 999–1000. Any confusion about which *Rapanos* opinion controlled

clarified that a "significant nexus" exists when the wetlands "significantly affect the chemical, physical, and biological integrity" of traditional navigable water. *Id*. Finally, Justice Kennedy added that the nexus requirement can be readily inferred if the wetlands are adjacent to navigable-in-fact water by the adjacency alone. *Id*.

Although phrases like "similarly situated" and "significant nexus" add some imprecision to the standard for determining when a wetland constitutes jurisdictional waters, both phrases provide an ascertainable, qualitative standard akin to others found in the law. *See Johnson*, 576 U.S. at 603–04 (explaining that standards like "substantial risk," "grave risk," and "unreasonable risk" are not vague when applied to actual conduct, rather than an imaginary crime); *United States v. Backlund*, 689 F.3d 986, 997 (9th Cir. 2012) (holding that "likely to cause a significant surface disturbance" standard not unconstitutionally vague). Plus, "similarly situated" has been clarified through regulatory guidance to mean other "wetlands adjacent to the same tributary." *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1022 (7th Cir. 2018) (describing post-*Rapanos* guidance issued by the agencies). Accordingly, even when wetlands require a "significant nexus" to traditionally navigable waters, the law is not unconstitutionally vague.

---

did not exist until *Davis* in 2016. Lucero, then, was "on notice from . . . *Healdsburg* at the time of his [dumping] activities that wetlands and non-navigable tributaries are subject to CWA jurisdiction if the wetlands" satisfy Justice Kennedy's significant nexus test. *United States v. Robertson*, 875 F.3d 1281, 1293 (9th Cir. 2017), *cert. granted, judgment vacated*, 139 S. Ct. 1543 (2019). We express no view on whether Justice Kennedy's concurrence continues to be the controlling decision from *Rapanos* following our decision in *Davis*.

Moreover, the facts of this case make the question much simpler. The government argued that the wetlands where Lucero dumped debris were adjacent to the Mowry Slough, which is a traditional navigable-in-fact water. As the government's counsel argued,

> [Lucero] dumped on property that you know . . . are adjacent to Mowry Slough. They border them. They are contiguous to them. And they are certainly neighboring them. They are close. And you can infer that that adjacency means that these lands have a significant nexus to the Slough.

Under Justice Kennedy's concurrence, these straightforward facts would be sufficient to infer the wetlands were "waters of the United States" if accepted by the jury. The government's proof demonstrates that the regulation is not vague as applied to Lucero's conduct. *See United States v. Harris*, 705 F.3d 929, 930, 932 (9th Cir. 2013) (relying on case-specific facts to reject as-applied vagueness challenge).

**2.**

Lucero also attacks the definition of "tributary" as unconstitutionally vague as applied to him. Although that term is not defined, this court has long recognized the common understanding of a tributary as "[a] stream which contributes its flow to a larger stream or other body of water." *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001) (citation omitted). This is an ordinary word, which has been given its ordinary meaning in prior caselaw. The jury instructions in Lucero's trial tracked this definition. Hence, the standard for identifying a tributary is not impermissibly vague.

Lucero tries to inject vagueness with two different arguments, neither of which is convincing.  First, he argues that it is unclear whether a water must be "relatively permanent" or if it can be "seasonal or intermittent" to still qualify as a "tributary" under the Act.  But there was no such confusion: at the time of Lucero's conduct, we had already held that seasonal streams can constitute tributaries.  *See Headwaters*, 243 F.3d at 534.  After *Rapanos*, we again affirmed our conclusion that "intermittent streams (at least those that are seasonal) can be waters of the United States." *United States v. Moses*, 496 F.3d 984, 991 (9th Cir. 2007).

Lucero next argues that the definition of tributary is vague because it is unclear whether a jury must find an "ordinary high water mark" ("OHWM").  But that definition has nothing to do with Tributary 1.  An OHWM is relevant only to determining whether an ephemeral stream is a water of the United States.  *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring); *see also* Final Notice of Issuance and Modification of Nationwide Permits, 65 Fed. Reg. 12818, 12823 (March 9, 2000) ("An ephemeral stream is a water of the United States, provided it has an OHWM. An ephemeral stream that does not have an OHWM is not a water of the United States.").  That means a seasonal, continuously flowing tributary can be a jurisdictional "tributary" without having an OHWM.  *See* 33 C.F.R. § 328.3(a)(5) (2014). Here, there was undisputed evidence that Tributary 1 had a continuous (albeit seasonal) flow.  Thus, whatever confusion might exist about jurisdiction over ephemeral streams, it is not relevant for Tributary 1.[14]

---

[14] Lucero also argues that it was not clear whether the government must show a "significant nexus" between Tributary 1 and a navigable water, or if Justice Kennedy's "significant nexus" test is only for

## C.

Finally, we address whether the newly promulgated 2020 regulation applies to Lucero's case. Lucero was convicted under the "water of the United States" regulation that was operative at the time of his offense conduct in 2014. *See* 33 C.F.R. § 328.3 (2014). Since then, the regulation has been revised several times. As relevant here, the agencies promulgated a new rule in April 2020 that substantially narrowed the definition of "waters of the United States" (and in turn, the scope of the Clean Water Act). *See* The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22,250 (April 21, 2020) ("2020 Rule").

The 2020 Rule represents a change in the law, which applies prospectively only and not to Lucero's case. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 247 (1994) (holding that amendment to Title VII of Civil Rights Act did not apply retroactively, even to cases pending on appeal). There is a general presumption that "'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.'" *Id.* at 264 (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)); *see also Consumer Fin.*

---

wetlands, rather than tributaries. *Compare Rapanos*, 547 U.S. at 767 (explaining that jurisdiction depends on "the connection [e.g., a significant nexus] between a *nonnavigable water or wetland* and a navigable water"); *with id*. at 787 (remanding for determination of whether the "*wetlands* at issue possess a significant nexus with navigable waters") (emphases added). But regardless, the jury instructions required the government to prove a significant nexus between Tributary 1 and Mowry Slough. So any error in imposing a significant-nexus element for Tributary 1 cuts in Lucero's favor by making it harder to convict him.

*Prot. Bureau v. Gordon*, 819 F.3d 1179, 1196 (9th Cir. 2016) ("While retroactivity of legislation and regulations is not per se unlawful, we have a presumption against retroactivity that generally requires that the legal effect of conduct . . . ordinarily be assessed under the law that existed when the conduct took place.") (internal quotation marks and citations omitted).[15]   Nothing in the text of the regulation suggests retroactive application.  To the contrary, it states that the new limits on what constitutes jurisdictional waters would "replace[] the recodified pre-2015 regulations, upon its effective date," 85 Fed. Reg. at 22,260, and that determinations made under prior versions of the regulation would be preserved.  *Id.* at 22,331–32.

Lucero's authority for applying the 2020 Rule retroactively is distinguishable because they relate to judicial (or administrative adjudicatory) decisions changing the law, rather than a newly enacted statute or regulation.   Such decisions apply retroactively because they are treated as "an authoritative statement of what the statute meant *before* as well as after the decision of the case giving rise to that construction," rather than as announcing a new law.  *Rivers v. Roadway Express Inc*., 511 U.S. 298, 312–13 (1994) (emphasis added).  Here, the 2020 rule is a new law, not a

---

[15] At common law, the presumption against retroactivity did not apply when a penal statute was repealed.  In such cases, outstanding prosecutions under the repealed statute could not continue.  *See Landgraf*, 511 U.S. at 271.  But that common-law rule was abrogated by statute.  *Id.* (citing 1 U.S.C. § 109); *see also United States v. Brown*, 429 F.2d 566, 568 (5th Cir. 1970) ("Under [1 U.S.C. § 109], penalties accruing while a statute was in force may be prosecuted after its repeal, unless there is an express provision to the contrary in the repealing statute.").

judicial interpretation of an existing law, so it does not apply retroactively.

## III.

Given the statutory definition of "pollutant," Lucero's conviction must be reversed because the jury instructions did not make clear that he had to know his discharge was "into water." We **REVERSE and REMAND** for a new trial.

---

BADE, Circuit Judge, dissenting in part:

I am pleased to join the majority's opinion except as to Sections II.A.1 and II.A.2, which conclude that the reference to "waters of the United States" in the Clean Water Act's (CWA) prohibition on discharges is a purely jurisdictional element and therefore not subject to the statute's "knowingly" mens rea requirement.[1] I do not believe that the text of the discharge prohibition supports the majority's

---

[1] Section 1311(a) of Title 33 makes unlawful "the discharge of any pollutant" without a license. To understand § 1311(a)'s application to this case, we must read it in light of the CWA's relevant definitions, in particular § 1362(6) (defining "pollutant" as listed substances "discharged into water"), § 1362(7) (defining "navigable waters" as "the waters of the United States"), and § 1362(12) (defining "discharge of a pollutant" and "discharge of pollutants," in part, as "any addition of any pollutant to navigable waters from any point source"). Section 1319(c)(2)(A), in turn, makes it a felony to "knowingly violate[] section 1311." For simplicity's sake, I will generally refer to the criminal prohibition at issue here—a product of "knitting together the various statutory provisions," *United States v. Pozsgai*, 999 F.2d 719, 726 (3d Cir. 1993)—as the "discharge prohibition."

reading, and I respectfully dissent from that part of the opinion.

## I.

"Stringing together" the relevant provisions, the majority reads the discharge prohibition as "prohibit[ing] any person from 'knowingly' engaging in the 'addition of any' listed substance 'discharged into water' 'to waters of the United States' from any point source." Maj. Op. 10–11 (quoting 33 U.S.C. §§ 1319(c)(2)(A), 1311(a), 1362(6), (7), (12)). The majority observes, however, that this reading yields an "apparent redundancy." Maj. Op. 11 (quoting *Pozsgai*, 999 F.2d at 726). Specifically, "to waters of the United States" seems to render the preceding prepositional phrase, "into water," superfluous. I agree that the various statutory provisions, when strung together, result in this apparent redundancy. I also agree with the majority's framing of the core question here: how "into water" and "to waters of the United States" "co-exist" in the discharge prohibition. Maj. Op. 11 (quoting *Pozsgai*, 999 F.2d at 726).

From there, however, we part ways. The majority reconciles the apparent redundancy by interpreting the substantive prohibition as covering the discharge of any listed substance "into water," and reading "waters of the United States" as merely jurisdictional. In other words, the majority concludes that discharging into "waters of the United States" does not "describe the evil Congress [sought] to prevent" in enacting the discharge prohibition, "but instead simply ensure[s] that the Federal Government has the constitutional authority to regulate the defendant's conduct." *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019) (internal quotation marks and citation omitted).

Because purely "jurisdictional elements normally have nothing to do with the wrongfulness of the defendant's conduct, such elements are not subject to the presumption in favor of scienter." *Id.* (citation omitted). Therefore, the majority concludes that the discharge prohibition's knowledge requirement does not apply to "waters of the United States," and thus a defendant need not know that the water into which he discharged a listed substance fell within the category of "waters of the United States" to be guilty of a felony.[2] Maj. Op. 11–17.

Certainly, this approach gives distinct meaning to each prepositional phrase: "into water" and "to the waters of the United States." But it does so at the cost of broadening the discharge prohibition into an absurdity, while at the same time failing to address situations where, as alleged here, a defendant dumps waste on dry land that nonetheless falls within the regulatory definition of "waters of the United States." Moreover, the chief justification for the majority's reading—the rule against surplusage—carries little weight when applied to the broader statutory structure, which applies multiple definitional provisions in the discharge prohibition.

---

[2] This case, however, differs from *Rehaif*, in which the Supreme Court explained that the "into or affecting commerce" element of 18 U.S.C. § 922(g), a statute prohibiting illegal aliens from possessing firearms, does not substantively add to the definition of the offense, but "simply ensures that the Federal government has the constitutional authority to regulate" the conduct in question. 139 S. Ct. at 2196 (citation omitted). Whether an illegal alien's possession of a firearm involves interstate commerce has no bearing on the "evil" the statute "seeks to prevent"—that is, illegal aliens possessing firearms. *Id.* But here, the question of *what* water one discharges a "pollutant" into has everything "to do with the wrongfulness"—or innocence—of that conduct. *See id.*

**II.**

In the majority's view, the discharge prohibition covers the addition of any "pollutant" "into water," while the "waters of the United States" element merely demarcates federal authority to enforce that prohibition. Maj. Op. 13–14. But if the discharge prohibition bans any act of adding a pollutant into water—regardless of *what* water—then it is absurdly overbroad.

The CWA defines a "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."    33 U.S.C. § 1362(6). If we simply apply this definition without also considering the substantive limitation that a prohibited discharge requires the addition of a pollutant to "the waters of the United States," *id.* § 1362(7), (12), then the discharge prohibition would stretch far beyond any reasonable notion of water pollution.

Under the majority's interpretation, the discharge prohibition could cover all sorts of innocent acts:  heating a tea kettle ("heat . . . discharged into water," § 1362(6)), using the restroom ("solid waste . . . discharged into water," *id.*), skipping a rock across a pond ("rock . . . discharged into water," *id.*), and even diving into a lake ("biological materials . . . discharged into water," *id.*).[3]  Lumping such

---

[3] The discharge prohibition only applies to additions of pollutants "from any point source." 33 U.S.C. § 1362(12). The majority interprets the "point source" element to ensure that "the 'water' involved be an equivalent to a body of water" for the discharge prohibition to apply.

innocuous acts together as part of "the evil Congress [sought] to prevent" in enacting the CWA, *Rehaif*, 139 S. Ct. at 2196 (internal quotation marks and citation omitted), would be absurd.

Of course, "the absurdity canon isn't a license for us to disregard statutory text where it conflicts with our policy preferences." *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015); *see Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 470–71 (1989) (Kennedy, J., concurring in the judgment) ("This exception remains a legitimate tool of the Judiciary, however, only as long as the Court acts with self-discipline by limiting the exception to situations where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result, and where the alleged absurdity is so clear as to be obvious to most anyone." (citation omitted)). As the Supreme Court has explained, a court should reject a reading of a statute as absurd only when it is "unreasonable to believe" that the legislature intended a result that follows from that reading. *Holy Trinity Church v. United States*, 143 U.S. 457, 459 (1892). Thus, for example,

---

Maj. Op. 19. But nothing in the definition of "point source" seems to limit the meaning of "water" or foreclose such a broad application of the discharge prohibition. *See* § 1362(14) ("The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."); *see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 105 (2004) ("[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters,' which are, in turn, defined as 'the waters of the United States.' Tellingly, the examples of 'point sources' listed by the Act include pipes, ditches, tunnels, and conduits, objects that do not themselves generate pollutants but merely transport them.").

a law "that whoever drew blood in the streets should be punished with the utmost severity did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit." *Id.* at 461 (internal quotation marks and citation omitted).[4]

The majority's interpretation of the discharge prohibition satisfies the high standard for absurdity. The necessary implication of the majority's reading—that Congress's limited authority under the Commerce Clause is the only barrier to criminally prosecuting every American's daily use of indoor plumbing—"makes it unreasonable to believe" that Congress intended "waters of the United States" solely as a jurisdictional element that does not substantively modify the discharge prohibition. *Id.* at 459. The majority's observation that Congress intended the CWA to be "an all-encompassing program of water pollution regulation," *Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981), and to "protect water in the United States as expansively as possible," Maj. Op. 14, does not make its conclusion—that

---

[4] The majority misses the point when it criticizes *Holy Trinity*'s holding as a "triumph of supposed 'legislative intent' (a handy cover for judicial intent) over the text of the law," Maj. Op. 19 n.8 (quoting Antonin Scalia, A Matter of Interpretation 18 (1997)). While *Holy Trinity* may have relied on extratextual inferences about legislative intent to justify its holding (that a statute banning "the importation and migration of foreigners and aliens under contract to perform labor or service of any kind in the United States" did not apply to an English church rector, 143 U.S. at 511 (citation omitted)), I cite it here only for its canonical description—often repeated in subsequent case law—of the absurdity doctrine. *See, e.g.*, *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 324 n.2 (1988) (Scalia, J., concurring in part) (citing the example of the law against drawing blood in the streets to illustrate the "venerable principle that a law will not be interpreted to produce absurd results").

the CWA "broadly proscrib[es] the dumping of pollutants 'into' any 'water,'" *id.* at 4—any less absurd.

The majority also attempts to justify its interpretation of the discharge prohibition by observing that "[v]irtually all water . . . eventually makes its way to navigable water." Maj. Op. 15 (quoting *Cnty. of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1470 (2020)). But the Supreme Court recognized limits to this broad approach in *Hawaii Wildlife Fund* when it concluded that "Congress did not intend the [CWA's] point source-permitting requirement to provide EPA with such broad authority as" this sort of "focus on traceability would allow." 140 S. Ct. at 1471. It reasoned, in part, that if the CWA's regulatory reach were coextensive with "the power of modern science" to trace water to a point source, this "would require a permit in surprising, even bizarre, circumstances, such as for pollutants carried to navigable waters on a bird's feathers, or, to mention more mundane instances, the 100-year migration of pollutants through 250 miles of groundwater to a river." *Id.* at 1470– 71. Similarly, here, regulating "[v]irtually all water" use based on the power of modern science to trace any water to navigable water, however geographically or temporally remote the connection, results in "bizarre" applications of the CWA that render that approach untenable. *See id.*

We avoid these problems if we acknowledge that the statute's reference to "waters of the United States" does not merely delineate the government's jurisdiction to enforce the discharge prohibition, but that it also plays a role in defining the prohibition itself. Accordingly, the discharge prohibition does not universally proscribe all discharges "into water," but rather, applies only to such discharges "to waters of the United States." 33 U.S.C. § 1362(6), (7).

Congress has delegated responsibility for determining the specific contours of "waters of the United States" to the Environmental Protection Agency and the Army Corps of Engineers, *see Rapanos v. United States*, 547 U.S. 715, 722–29 (2006) (plurality opinion), and those agencies' definition of the term, set forth at 33 C.F.R. § 328.3, plainly does more than merely identify the outer bounds of federal authority under the Commerce Clause.  It distinguishes between harmful and innocent conduct and thus avoids prohibiting many activities that would otherwise fall within a blanket prohibition on discharging any pollutant "into water."  *See, e.g.*, 33 C.F.R. § 328.3(a) (2014) (defining "waters of the United States" as territorial seas and waters used or susceptible to use in interstate commerce, including waters subject to tides; tributaries; lakes, ponds, and impoundments of jurisdictional waters; and adjacent wetlands); *see also id.* § 328.3(b) (categorically excluding certain waters, including "[p]rior converted cropland" and "[w]aste treatment systems").[5]  Thus, for example, the definition of "waters of the United States" makes clear that the discharge prohibition is not violated by heating a tea kettle or using the restroom because the water in these examples does not fall within, or is excluded from, the categories of water that the regulation identifies.  *See id.* § 328.3(a).[6]

---

[5] The current version of the regulation also includes categorical exceptions, for example, for "[g]roundwater, including groundwater drained through subsurface drainage systems," "[p]rior converted cropland," and "[w]aste treatment systems."  33 C.F.R. § 328.3(b) (2020).

[6] As the majority observes, Maj. Op. 17 n.7, the agencies have referred to "waters of the United States" as "jurisdictional waters." *See* 33 C.F.R. § 328.3(a) (2020); Clean Water Rule: Definition of "Waters of the United States", 80 Fed. Reg. 37054-01, 37057 (June 29, 2015).

**III.**

Moreover, the majority's interpretation of the discharge prohibition as criminalizing all discharges "into water" is not only absurdly overbroad, but also underinclusive because it fails to address situations in which "dry land might be treated as 'navigable waters' under the Clean Water Act." Maj. Op. 4. Neither the statute nor any relevant regulation defines the terms "into water" or "water." Instead, the statute relies on the term "waters of the United States," and the regulatory definitions of that term, to define its reach. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 625 (2018) ("The statutory term 'waters of the United States' delineates the geographic reach of many of the Act's substantive provisions . . . ." (citations omitted)); s*ee also Rapanos*, 547 U.S. at 722–29 (summarizing the evolving interpretations of "waters of the United States" that have allowed "the immense expansion of federal regulation of land use that has occurred under the Clean Water Act").

If the term "waters of the United States" is solely jurisdictional and not a substantive element of a violation of § 1311(a), then we would be left to interpret the substantive discharge prohibition based on the plain meaning of "water," which would certainly not cover discharges into arroyos, areas adjacent to water, or other dry areas. *See Water*,

---

But no regulation states that the category is *solely* jurisdictional. Moreover, it appears that the agencies are using the term "jurisdictional" not in the sense of Congress's constitutional authority to legislate, *see Torres*, 136 S. Ct. at 1624, but rather to describe their own "statutory authority (that is, [their] jurisdiction)," *City of Arlington v. F.C.C.*, 569 U.S. 290, 296–97 (2013), that Congress has delegated them to enforce the CWA. *See* 33 C.F.R. § 328.1 ("This section defines the term 'waters of the United States' as it applies to the jurisdictional limits of the authority of the Corps of Engineers under the Clean Water Act.").

Oxford English Dictionary (3d ed. 2015) ("The substance (most commonly encountered as a liquid) which is the principal constituent of seas, lakes, and rivers, and which falls as rain and other forms of precipitation."). If "waters of the United States" were a purely jurisdictional element, whose "purpose" was "to *limit* the reach of [the] statute," *United States v. Alderman*, 565 F.3d 641, 647 (9th Cir. 2009) (emphasis added) (citation omitted), it could not expand the CWA's reach to areas the substantive prohibition fails to cover. Thus, "waters of the United States" substantively defines the discharge prohibition not only by ensuring it does *not* reach harmless, everyday conduct involving water; it also ensures the CWA *does* reach cases of bona fide water pollution when a polluter does not dump directly into water.[7]

In responding to this point, the majority in fact confirms it. While it correctly observes that the Supreme Court has recognized that it would be "simplistic" to limit the CWA's reach to "hydrographic features more conventionally identifiable as 'waters,'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131–32 (1985), neither the Court nor the agencies has ever relied on "into water" to extend the CWA's reach beyond conventional water. When the Supreme Court construed the term "*waters*" (not "water") in *Riverside Bayview Homes*, it did so only in analyzing whether that word, as it appeared in "waters of the United States," limited the government's power to regulate discharges. *Id.* at 132. Given the virtually exclusive role of

---

[7] The majority suggests that "[t]he government has the greatest interest in ensuring the ability to prosecute cases under the CWA and it does not share [this] concern." Maj. Op. 21 n.10. But it is not clear how the government's unstated views of its own interests could bear on our task here: to determine from the language of the statute how Congress intended "waters of the United States" to function in the discharge prohibition.

the "waters of the United States" element as the CWA's vehicle for determining the reach of the discharge prohibition, it is clear that it substantively defines the prohibition.

## IV.

Nonetheless, if the phrase "to waters of the United States" plays a role in defining the substantive prohibition, then the phrase "into water" appears to be redundant and unnecessary—at least in the discharge prohibition. And this redundancy is in tension with the rule against surplusage, which states that "[i]f possible, every word and every provision is to be given effect" in our construction of a statute. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012). But the "preference for avoiding surplusage constructions is not absolute." *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004) (citation omitted).

Here, the rule against surplusage carries little weight because, even under Lucero's reading, "into water" is not entirely superfluous. Granted, it functions superfluously in this particular application, where a single substantive provision, 33 U.S.C. § 1311(a), incorporates overlapping definitional provisions that include similar prepositional phrases. But although the phrase "into water" in the definition of "pollutant," *id.* § 1362(6), is redundant when combined with the phrase "to waters of the United States" in the definition of "discharge of a pollutant," *id.* § 1362(7), (12), it performs a non-redundant role in other statutory provisions that reference "pollutant" but not "discharge." *See* 33 U.S.C. § 1252(c)(2)(B) (referring to the "collection, storage, treatment, and elimination of pollutants"); 33 U.S.C. § 1258(a) (discussing "removal of pollutants and prevention of any polluting matter").

Unlike situations in which a court interprets a single statutory provision as containing a redundancy, thus actually "render[ing]" some of the provision's language "a nullity," *In re Cervantes*, 219 F.3d 955, 961 (9th Cir. 2000) (citations omitted), the rule against surplusage is not dispositive here because Lucero's proposed reading does not truly render meaningless any words that Congress enacted. Instead, it merely results in an "as-applied" redundancy. While this redundancy stands in some tension with the rule against surplusage, it is fundamentally consistent with that rule's teaching that "a statute ought, *upon the whole*, to be so construed that, if it can be prevented, no clause is rendered superfluous, void, or insignificant." *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1352 (2015) (emphasis added) (internal quotation marks and citation omitted).

Indeed, the rule against surplusage "cannot always be dispositive because . . . the underlying proposition is not *invariably* true. Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance . . . ." Scalia & Garner at 176. Such repetition is particularly understandable when two definitions, in this case "pollutant" and "discharge," apply to a range of substantive provisions and thus lead to redundancies when both are applied in a single provision.

## V.

The majority gives short shrift to these considerations when it rejects Lucero's reading of the discharge prohibition. It proclaims that "we have no roving license to disregard statutory text to make our jobs easier in interpreting it." Maj. Op. 12 (quotation marks and citation omitted). While this statement is correct, it is misplaced here. Lucero has not asked us to disregard the statute's language in favor of some extratextual consideration. *See* Scalia & Garner at 235

("What the rule of absurdity seeks to do is what all rules of interpretation seek to do: *make sense* of the text."). Rather, he asks us to adopt one of two readings of a convoluted statute whose language forces us to choose either an absurd implication or an incidental redundancy.

To be sure, I do not easily conclude that any words in a statute are superfluous to its meaning. But under the circumstances here, which require "knitting together the various statutory provisions," *Pozsgai*, 999 F.2d at 726, I agree with Lucero that the statute's text favors such a reading. *See Amoco Prod. Co. v. Watson*, 410 F.3d 722, 734 (D.C. Cir. 2005) ("No canon of construction justifies construing the actual statutory language beyond what the terms can reasonably bear." (citation omitted)). The majority, seeking in good faith to apply the statute's language, has reached a different conclusion. But it is mistaken when it suggests that the competing interpretation is simply the result of "disregard[ing] statutory text," Maj. Op. at 12, or an attempt to "improve upon" the statute Congress drafted, *id.* at 12 (quoting *Pavelic & LeFlore v. Marvel Ent. Grp., Div. of Cadence Indus. Corp.*, 493 U.S. 120, 126 (1989)).

The majority also misunderstands my approach, which it characterizes as "myopically focus[ed] on a single . . . phrase" to the exclusion of its broader context in the CWA. Maj. Op. 18. To the contrary, I read "waters of the United States" as substantively defining the discharge prohibition precisely *because of* its role in the broader statutory context. To summarize, I conclude that the "waters of the United States" element substantively defines the discharge prohibition because it plays an integral role in "defin[ing] the evil Congress seeks to prevent" through the CWA, no other statutory or regulatory provision can plausibly substitute for

it in this role, and the majority's chief reason *not* to read both "waters of the United States" and "into water" substantively—the rule against surplusage—is unconvincing given the use of the definitional provisions across the CWA.

Although the phrase "to waters of the United States" functions partly as a jurisdictional element, tying "the substantive offense . . . to one of Congress's constitutional powers . . . , thus spelling out the warrant for Congress to legislate," *Torres v. Lynch*, 136 S. Ct. 1619, 1624 (2016), this is not the only role it plays. It is also the only element in the discharge prohibition that allows us to distinguish between entirely innocent conduct and criminal conduct. Therefore, it is subject to "the presumption . . . that 'Congress intends to require a defendant to possess a culpable mental state regarding each of the statutory elements that criminalize otherwise innocent conduct.'" *United States v. Collazo*, 982 F.3d 596, 611 (9th Cir. 2020) (quoting *Rehaif*, 139 S. Ct. at 2195).

## VI.

For these reasons, I respectfully dissent from the majority's holding that the discharge prohibition's mens rea requirement does not apply to the "waters of the United States" element. The majority concludes that the government must "prove only that a defendant knew he discharged a substance 'into water.'" Maj. Op. 17. In contrast, I would vacate the conviction and remand for further proceedings because the jury instructions did not require the jury to find that Lucero knowingly discharged a pollutant into "waters of the United States," as defined by the CWA and the relevant regulations.